

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. PD-1485-10

---

### THE STATE OF TEXAS

### v.

### CAROLYN SUE KRIZAN-WILSON, Appellee

---

### ON APPELLEE'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FOURTEENTH COURT OF APPEALS
### HARRIS COUNTY

---

**JOHNSON, J., delivered the opinion for a unanimous Court.**

### O P I N I O N

On September 22, 1985, appellee's husband, Roy McCaleb, was murdered in his home.

Appellee was indicted for the murder on July 14, 2008, nearly 23 years later. Appellee filed a

motion to dismiss the indictment, alleging that the pre-indictment delay violated, *inter alia*, her rights

to due process, due course of law, and a fair trial. After holding an evidentiary hearing, the trial

court granted the motion, made factual findings and conclusions of law favorable to appellee's

motion, and ordered the indictment dismissed. On appeal, the Fourteenth Court of Appeals held that

the trial court erred in dismissing the indictment and reversed and remanded the cause to the trial

court for further proceedings.[1]

This Court granted the first issue presented in appellee's petition for discretionary review, in which appellee argues that: "The trial court found that the 23-year pre-indictment delay substantially prejudiced petitioner and was grounded in an impermissible purpose. The Court of Appeals erred in reversing that ruling because: (1) a reasonable judge could have found that the delay was grounded in an impermissible purpose; and (2) the Fifth Amendment Due Process Clause does not require petitioner to demonstrate an impermissible purpose—a nearly impossible task—but instead shifts the burden to the government (upon a showing of substantial prejudice) to demonstrate a reasonable explanation for the delay." After review, we affirm the court of appeals and remand the cause to the trial court for further proceedings.

## I. Evidentiary Hearing

The record of appellee's hearing on her motion to dismiss sets out the relevant facts about the murder. On the night of September 22, 1985, appellee was at home with her husband, her youngest son Robert, and Robert's wife. The house had three bedrooms: one in which appellee stayed, one in which the victim stayed, and one in which Robert stayed. Appellee reported to the police that an intruder had entered the house, sexually assaulted her, and shot her husband. Robert was in the bedroom across the hall when the incident allegedly took place. Robert's wife was still in the house when an intruder allegedly broke into the house, but had left by the time the murder occurred. Appellee also reported to the police that, approximately ten days prior to the murder, a man broke into her car and sexually assaulted her in a nearby park. Appellee believed that the intruder was the same person who had previously assaulted her.

---

[1] *State v. Krizan-Wilson*, 321 S.W.3d 619 (Tex. App.—Houston [14th Dist.] 2010).

The Houston police responded to the scene and interviewed appellee and her son at length. Appellee gave the police a written statement, and her attorney brought a prepared statement in to the police department several days later. The police conducted a crime-scene investigation and collected evidence, but they did not find any signs of a forced entry or footprints around the perimeter of the house. The police began to search for the alleged assaulter in the vicinity of the crime scene based upon the description that appellee provided. When officers could not find anything that would substantiate a rapist in the area, they turned their attention towards appellee. After completing an investigation, the police investigators and district attorney's office were in agreement that they did not have enough evidence against appellee to convict her of murder, but instead filed a bigamy charge against her. This charge was ultimately dismissed.

In 2007, the cold case squad of the Houston Police Department reviewed the case against appellee and decided to have a piece of the original evidence tested for DNA; this testing did not produce any new evidence. The police department presented the case to the Harris County District Attorney's office in the spring of 2008. After discussing the case with a few members of the Major-Offenders division that did not initially work on the case, the district attorney's office brought the case to the grand jury. Nearly 23 years after the murder, with no new evidence discovered, appellee was indicted for murder.

Appellee's first witness at the hearing on her motion to dismiss was Dr. Jon DeFrance, a clinical neuro-psychologist who testified that, in relation to other people her age, appellee suffers from moderately impaired executive functions: her mental processing speed is quite slow and her working memories are distorted. Dr. DeFrance hypothesized that these deficits could be due to significant head trauma that appellee reportedly suffered from an automobile accident while in high

school. Due to these impaired functions, Dr. DeFrance stated that appellee would not be able to give a precise, reliable and accurate rendition of the occurrences on the day of the murder—she would confuse pertinent facts about the case and has a diminished capacity to reconstruct events through source memory. In comparison to her executive functioning 23 years earlier, appellee would be tremendously disadvantaged in terms of assisting counsel in her defense. However, on cross examination, Dr. DeFrance admitted that appellee was competent to stand trial and that his comparison regarding her diminished executive functioning is based upon speculations about her executive functioning at the time of the murder.

Next, appellee called her son, Lloyd Gregory Krizan, a retired lieutenant for the Houston Police Department. He testified that this mother has suffered a mental deterioration since 1985, including significant memory problems. She regularly repeats herself, gets incidents mixed up, and can't tell a story because she cannot keep the facts straight. Krizan explained that his mother's memory issues have gotten progressively worse since 1985. He further noted that his mother has been living adjacent to him for the last 15 years and has been easily available since the murder occurred.

Waymon Oliver Allen, a private investigator, was appointed to assist appellee's counsel in July, 2008. At the evidentiary hearing, Allen testified that appellee hired Clarence Thompson to represent her in 1985. Thompson died in 1988, and after contacting Thompson's widow, former office colleague, probate lawyer, private investigator, and estate attorney, Allen was not able to locate Thompson's legal files regarding his representation of appellee. Nor was Allen able to recover evidence originally collected by the defense and sent to a lab in Pasadena. Allen spoke with Rafael Gonzales, a private investigator that had worked for Mr. Thompson on the case, but Gonzales

was not able to give Allen any additional information because Gonzales had a very vague recollection of the case and had turned over all evidence to Mr. Thompson. The forensic expert hired by the defense, Floyd McDonald, is now deceased as well and is therefore unable to testify about the results of the physical evidence collected from the crime scene that he examined. Allen noted that, had the case been tried immediately after the victim was killed, other potential evidence—such as footprints around appellee's house—may have been discovered by the defense.

Allen further testified that, at the time that appellee gave her oral statements to the police, she made outcry statements to two co-workers that she had been sexually assaulted ten days before the murder. Appellee alleged that the assaulter got into her car and drove to a small park located a few blocks from her home. Allen reported that there was no documentation that the vehicle was ever processed, nor was the car currently available to be processed. Further, Allen found no reports indicating that the Houston Police searched for corroborating evidence at the park where appellee alleged that the assault occurred.

Allen reported that the victim's medical records, in regards to both a worker's compensation claim that he had made shortly before his death and regarding the death itself, had been destroyed. According to Allen, the worker's compensation medical records were relevant to counter the state's theory that appellee's motive for killing her husband was to collect life insurance proceeds from his death. Allen reported that appellee's medical records about her second sexual assault, which allegedly took place during the same incident when her husband was killed, were also no longer available.

Allen further relayed that several witnesses that were interviewed at the time of the incident were either dead, could not remember specifics, or could not be located. These witnesses included:

Carl Fuller, appellee's former co-worker; Gary Bunker, appellee's and victim's former neighbor; and Harry Krater, appellee's former neighbor to whom appellee "had told . . . everything." Several other neighbors that were initially interviewed by the police have remained in the same residences since the incident but had not responded to Allen's attempts to contact them as of the time of the hearing. Allen noted that the state has not discovered or obtained any newly discoverable evidence since 1985.

The state's first witness was Robert Parish, a former Houston Police Officer who was one of the original homicide investigators working on this case in 1985. Parish testified that, after conducting a crime-scene investigation and interviewing appellee and her son extensively, the investigating officers and the assistant district attorney, Chuck Rosenthal, were in agreement that the prosecution did not have a winnable case. According to Parish, none of the people involved had any intention of gaining a tactical advantage in their decision not to initially pursue the case. While there were tests that were developed after 1985 that were later used on the existing evidence, no additional information resulted, and Parish's opinion regarding the quality of the case has remained unchanged.

Next, the state called D.S. Wilker, a retired police officer who had returned to the Houston Police Department to work in the cold case squad. Wilker testified that, when she began to investigate this case in 2007, she asked the Houston Police Department Crime Lab to retrieve and test evidence that was still available in the police property room, including appellee's underwear that had been cut off appellee after the murder, a gown that appellee was wearing on the night of the murder, hairs, fibers, and various debris that were recovered from a bathtub full of water after appellee took a bath, and one dried blood spot. The testing revealed no new information.

Vic Wisner testified that, while working as a Harris County Assistant District Attorney in

2008, he received a call regarding this case from D.S. Wilker. According to Wisner, the case was not prosecuted initially because the prosecutors incorrectly believed that they had to disprove appellee's story, which they did not feel that they could do. Instead, the prosecutors filed a bigamy charge against appellee in order to get her into jail. That case was later dismissed. After reviewing the case with two colleagues and finding merit, Wisner drafted an arrest warrant for appellee and presented the case to the grand jury.

Finally, the state called Curt Billy Bonzal, an investigator for the Harris County District Attorney's Office. Bonzal testified that he was able to locate almost all of the current, former, and retired police officers who, according to the offense report, were at the crime scene or investigated the case in 1985. Bonzal was also able to speak with five witnesses listed in the offense report who live or lived on the street on which the crime occurred, as well as Carl Fuller, a friend of the family who had been at the crime scene earlier that day. Further, Bonzal collected DNA swabs from Fuller, appellee, and appellee's son Robert, who was in the house at the time of the murder, and submitted the swabs to the Houston Police Department Crime Lab. Bonzal testified that there were no witnesses that he searched for that he could not find.[2]

## II. Standard of Review

Statutes of limitations are the primary guarantee used to protect citizens from stale criminal charges that impair those citizens' abilities to defend themselves.[3] However, such statutes are not the only redress the accused have against extended charging delays; "the Due Process Clause [of the

---

[2] While Bonzal noted that he could not locate Officer J.T. Norris, he also stated that he had "personally contacted him." It is unclear from the record whether Bonzal had actually spoke to Officer Norris.

[3] *United States v. Marion*, 404 U.S. 307, 322-324 (1971).

Fifth Amendment] has a limited role to play in protecting against oppressive delay."[4]  The Supreme Court refrained from determining, in the abstract, the circumstance in which a pre-indictment delay would result in a due-process violation, leaving the case-by-case assessment in the hands of the lower courts.[5]  However, the Court provided guidance to the courts of appeals' analysis by stating that "*Marion* makes clear that proof of prejudice is generally a necessary but not sufficient element of a due-process claim, and that the due-process inquiry must consider the reasons for the delay as well as the prejudice to the accused."[6]

The federal circuit courts have split as to the standard by which to analyze such allegations of due-process violation.  Several circuits, including the Fifth Circuit prior to its decision in *Crouch*,[7] have held that a defendant who moves to dismiss an indictment because of delay bears the burden of demonstrating that the delay caused substantial prejudice to the defendant's ability to defend himself.  Once the defendant fulfills this burden, the onus shifts to the state to proffer a reason for such delay.  The court then balances the prejudice to the defendant and the length of delay against the state's need for the delay in order to determine whether a due-process violation has occurred.[8]  In making such a balancing determination, hostile intent or a bad-faith purpose are not necessary in

---

[4] *United States v. Lovasco*, 431 U.S. 783, 789 (1977).

[5] *Id*. at 796.

[6] *Id*. at 790.

[7] *Crouch v. State*, 84 F.3d 1497, 1514 (5th Cir. 1996).

[8] *See, e.g.*, *United States v. Townley*, 665 F.2d 579 (5th Cir. 1982); *see also United States v. Corona-Verbera*, 509 F.3d 1105 (9th Cir. 2007); *United States v. Sowa*, 34 F.3d 447, 451 (7th Cir. 1994); *Howell v. Barker*, 904 F.2d 889, 895-96 (4th Cir. 1990); *United States v. Moran*, 759 F.2d 777, 782 (9th Cir. 1985).  *Cf. United States v. Ray*, 578 F.3d 184, 199-200 (2nd Cir. 2009) (must show both prejudice and an unjustified reason for delay, but factors are weighed against each other and surrounding circumstances).

order to find that a delay has violated those "fundamental conceptions of justice which lie at the base of our civil and political institutions,[9] and which define the community's sense of fair play and decency."[10]

The Fifth Circuit strayed from the *Townley* balancing test in *Crouch* when it held that, "where an indictment is returned within the statute of limitations, pre-indictment delay does not violate due process unless that delay, in addition to prejudicing the accused, was intentionally brought about by the government for the purpose of gaining some tactical advantage over the accused in the contemplated prosecution or for some other bad faith purpose."[11] This Court has followed the Fifth Circuit's bright-line methodology in holding that, in order to be entitled to relief, a defendant must demonstrate that the delay: 1) caused substantial prejudice to his right to a fair trial, and 2) was an intentional device used to gain a tactical advantage over the accused.[12] While not fully adopting the Fifth Circuit's "other impermissible, bad-faith purposes"[13] language, this Court found in *Ibarra* that the state's pre-indictment delay did not violate the Due Process clause because "nothing in the record suggests that the State intentionally delayed the case to gain a tactical advantage over appellant *or otherwise acted in bad faith*."[14] In doing so, this Court effectively left open the possibility the state may commit a due-process violation for reasons other than to gain a tactical advantage, but has not

---

[9] *Lovasco*, 431 U.S. at 790.

[10] *Id*. (citing *Rochin v. California*, 342 U.S. 165, 173 (1952)).

[11] *Crouch,* 84 F.3d at 1523.

[12] *Spence v. State*, 795 S.W.2d 743, 749 (Tex. Crim. App. 1990), *cert. denied*, 499 U.S. 932 (1991); *Ibarra v. State*, 11 S.W.3d 189, 193 (Tex. Crim. App. 1999).

[13] *Crouch*, at 1514.

[14] *Ibarra*, 11 S.W.3d at 193 (emphasis added).

specified which reasons constitute "bad faith purposes."

In reviewing the dismissal of an indictment, the appellate court must review the trial court's ruling under a bifurcated standard.[15] The court of appeals must give almost total deference to a trial court's findings of facts that are supported by the record, as well as mixed questions of law and fact that rely upon the credibility of a witness.[16] However, the court of appeals applies a *de novo* standard of review to pure questions of law and mixed questions that do not depend on credibility determinations.[17]

## III. Court of Appeals

The Fourteenth Court of Appeals held that, as a matter of law, the evidence did not establish that the prosecutorial delay was intentionally committed in order to gain a tactical advantage over appellee or for some other improper purpose. The court of appeals found that, whether Vic Wisner's testimony was believed or disbelieved by the trial judge, appellee still did not meet her burden of proof as to the second prong of the due-process analysis. Although the delay was not for investigative purposes, the only evidence relating to the pre-indictment delay simply showed a disagreement as to the merits of the case between the original prosecutors and police investigators, and a later prosecutor. Therefore, the trial court erred in dismissing the indictment on the ground that appellee's due-process rights were violated.

## IV. Analysis

## A. Trial Court Deference

---

[15] *Guzman v. State*, 955 S.W.2d 85, 87–89 (Tex. Crim. App. 1997).

[16] *Id; see also State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004).

[17] *Id.*

Appellee first claims that the court of appeals erred by failing to afford the requisite level of deference to the trial court's factual findings. The court of appeals found that the trial court's ruling was a "resolution of a question of law [that] does not turn on an evaluation of credibility and demeanor"[18] and reviewed the issue under a *de novo* standard. According to appellee, the issue of whether the state intentionally delayed prosecution in order to gain a tactical advantage over the defendant, or otherwise prejudice her, is a factual finding. Therefore, the court of appeals must apply the standard of abuse of discretion, overturning the trial court's finding only if it is unsupported by the record.[19]

While appellee properly states the standard of review for a trial court's factual findings, appellee is mistaken that the trial court's determination regarding the state's motivation for delay is a "finding of fact." Rather, the conclusion that "[t]he State's delay of the prosecution of Defendant for more than two decades is for the purpose of gaining a tactical advantage over the Defendant at trial"[20] is an "application of law to fact" ruling which turns on the trial judge's evaluation of the credibility and demeanor of the witnesses. Although appellee incorrectly categorized the trial court's conclusion, appellee is correct that the court of appeals applied the incorrect standard of review and should have reviewed the trial court's ruling under an abuse of discretion standard, upholding the trial court's ruling as long as it was supported by the record.

However, after reviewing the record of appellee's hearing on her motion to dismiss the indictment, we find that the court of appeals correctly determined that there is no evidence in the

---

[18] *Krizan-Wilson*, 321 S.W.3d at 623-624.

[19] *Cantu v. State*, 817 S.W.2d 74, 77 (Tex. Crim. App. 1991).

[20] C.R.-Supp. at 10.

record that the prosecutorial delay was intended to gain a tactical advantage over appellee or for another improper purpose. Appellee presented no evidence that suggested that the state delayed the case for any reason other than a difference in opinions between the original prosecution team and other prosecutors 23 years later. Therefore, the trial court's resolution of this mixed question was not supported by the record. Despite the application of an incorrect standard of review, the court of appeals afforded the trial court the proper level of deference.

As the court of appeals noted, even if the witnesses' testimonies—and specifically Vic Wisner's testimony—is believed or disbelieved, there is still no evidence of strategic intentional delay. During her hearing on her motion to dismiss, appellee had the burden to prove that the state's delay was an intentional device used to gain a tactical advantage.[21] It is not enough for appellee to argue that the trial court may have disbelieved each and every witness that testified that the state had no negative intentions for the delay, appellee must still present positive proof of such an improper purpose.[22] Appellee failed to do so and therefore, did not meet her burden of proof.

Appellee's son Lloyd, a retired lieutenant in the Houston Police Department, stated that he believes that these charges against his mother should have been filed sooner if they were going to be filed. Nevertheless, he admitted that he did not believe that the prosecutors had any evil intentions for the delay and that he had previously witnessed officers and assistant district attorneys have good-faith differences as to the merits of a case.[23] Robert Parish, the original police

---

[21] *Spence*, at 749; *Ibarra*, at 193.

[22] *See Janecka v. State*, 937 S.W.2d 456, 471-472 (Tex. Crim. App. 1996) (absent some positive evidence of coercion, appellant's contention that jury "could have" disbelieved officer testimony or "could have interpreted" police's statements as coercive not enough to prove trial court error for failing to give voluntariness-of-confession instruction)

[23] II R.R. at 130.

investigator working on this case in 1985, testified that he and the district attorney's office were initially in agreement that they did not have enough to go forward. Even though his opinion of the case remains the same, he did not know of any discussions amongst the prosecutors or investigators that the filing of the case was to be delayed for tactical reasons.

Vic Wisner testified that he and his colleagues in the Major-Offenders division of the Houston District Attorney's Office were all in agreement that this was a winnable case; the only reason that it was not filed in 1985 was that the original prosecutors labored under a faulty theory of law. The original detective on the case still felt that the case lacked sufficient evidence for a conviction, yet the new prosecutors disagreed. Wisner never felt that anyone was acting in bad faith. Although Wisner believed that the district attorney's office would not have filed the bigamy charge against appellee had they not suspected her of the murder, he explained that this had been standard practice of the district attorney's office in 1985.

The court of appeals applied an incorrect standard of review, however, correctly found that the evidence presented at appellee's hearing on her motion to dismiss the indictment failed to show that the prosecutorial delay was grounded in an impermissible purpose. Accordingly, the court of appeals afforded the trial court the appropriate level of deference. We overrule sub-issue (1).

## B. Bad Faith

Appellee next claims that the Fifth Amendment Due Process Clause does not require appellee to prove that the state delayed its prosecution for an impermissible purpose. Rather, upon proving prejudice, the burden shifts to the state to proffer a reasonable explanation for the delay. The court of appeals incorrectly found that it was bound on this issue by prior reasoning from the Fifth Circuit opinion that required proof of invidious governmental intent or bad faith. Appellee is correct that

the court of appeals was not bound by the Fifth Circuit ruling with respect to the framework in which to conduct a due-process analysis. However, the court of appeals is bound by the precedents of this Court, which has held for more than two decades that, in order to establish a due-process violation, appellee has the burden of proving both prejudice and that an intentional delay was designed to give the state a tactical advantage.[24] In *Ibarra*, this Court reaffirmed the two-pronged protocol that must be satisfied in order to obtain relief under the Fifth Amendment's Due Process Clause. Accordingly, appellee's sub-issue (2) is overruled.

## C. Due-process Analysis

The court of appeals correctly found, and the state concedes, that appellee has suffered prejudice from the lengthy delay of this case. Appellee's original attorney, Clarence Thompson, has died, and his files cannot be located. Thompson's former investigator does not recall the case, and the evidence that he collected and handed over to Thompson has been lost. The forensic investigator hired by Thompson is also deceased, and other potential evidence from the crime scene is no longer available. Among appellee's witnesses, some have died. The whereabouts of others are unknown, or the memories of others have faded. Medical records pertaining to the victim's transportation to the hospital, the victim's worker's compensation claim, as well as the alleged sexual assault on appellee have all been destroyed. Finally, appellee presented significant evidence regarding her mental deterioration and inability to testify in her own defense. Appellee has proved the first element of the due-process analysis, prejudice to one's ability to defend oneself.

However, appellee fails to meet the second prong. As noted in our analysis of sub-issue (1),

---

[24] *Spence*, 795 S.W.2d at 750 ("Appellant has been able to show delay; however, he has not met his burden to show that it was an intentional delay which was designed to give the State a tactical advantage over him.").

no evidence was presented that leads to the conclusion that the state delayed appellee's indictment in order to gain a tactical advantage or for other bad faith purposes. The only evidence presented to explain the delay is that a new prosecutor now believes, 23 years later and based on the same evidence, that the case is worth prosecuting. In her brief, appellee argues that

> Wisner's testimony demonstrated bad faith on the State's part by showing that the State: (1) intentionally withheld filing the charge because, although the case was a strong and easy case from the State's perspective, the State wanted to be in a better situation to overcome Petitioner's defensive theory; and (2) chose not to file the murder charge against Petitioner but filed a bigamy charge that would never have been [filed] against someone else.

Appellee argues that the former point demonstrates that the state's intent for delaying was specifically focused on the strength of appellee's defense, rather than the strength of its own case. In doing so, appellee ignores the fact that the prosecutors and detectives initially working on this case did not believe that the case was a "strong and easy case." To the contrary, the officers and assistant district attorneys originally assigned to this case were in agreement that the case was not winnable. Only after 23 years, when a new prosecutor examined the file, did a prosecutor believe that this case was strong enough to try. Even after indictment, the original investigators and Wisner disagreed as to the strength of this case.

Moreover, appellee misconstrues Wisner's testimony regarding the state's response to appellee's defensive theory. Wisner testified that the state did not file this case in 1985 because the original prosecutor labored under a faulty theory of law—that the state needed to disprove appellee's story rather than prove the elements of the prosecution's case beyond a reasonable doubt. In acknowledging this incorrect assumption, Wisner's testimony supports the opposite conclusion: the state's intention in failing to file this case in 1985 was not to put the state in a better position to overcome appellee's defensive theory, but rather, other assistant district attorneys realized in 2008

that the state did not need to overcome this hurdle. These prosecutors believed that, under the correct theory of law, the evidence was legally sufficient to convict.

Appellee also contends that the state's decision to charge appellee with bigamy, a charge that the state admittedly would not have filed except for its suspicion that appellee was guilty of murder, proves the state's bad intentions. However, Vic Wisner testified that, in 1985, it was common practice among Harris County prosecutors to file a less or equally serious crime against a person who was suspected of a higher crime in order to present evidence of that higher crime at the punishment stage. This strategic decision by the district attorney's office, on its own, fails to establish the requisite ill-intent of the state's postponed filing of the murder charge.

While appellee has shown significant prejudice as a result of the state's delay, the second prong of this two-part analysis cannot be established by fulfilling the first; proving delay and prejudice does not prove bad faith.[25] There is no requirement that the police or prosecutors conduct a continuous investigation,[26] and "prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt."[27] Nor are prosecutors required to file public charges immediately when the state

---

[25] *See United States v. Proctor*, 505 F.3d 366, 370 (5th Cir. 2007) (prosecutorial delay in filing not bad faith when prosecutors had "all the evidence to prosecute" five years prior); *State vs. White*, No. 03-07-00041-CR, 2010 Tex. App. LEXIS 6766, at *18 (Tex. App.—Austin, August 19, 2010, no pet.) (not designated for publication) (death of as many as 27 witnesses over 17-year delay proved prejudice but not bad faith); *Grimaldo v. State*, No. 07-99-0006-CR, 2000 Tex. App. LEXIS 4186, at *3 (Tex. App.—Amarillo, June 21, 2000, no pet.) (mem. op., not designated for publication) (proof of 20-month delay for no good reason failed to prove bad faith).

[26] *Ibarra*, at 193-194.

[27] *Lovasco,* at 791.

has obtained enough evidence to prove guilt beyond a reasonable doubt.[28]  As described by the United States Supreme Court in *Lovasco*, such a requirement would cause injurious societal harms to the rights of the accused, law enforcement, prosecutors, and the judicial system.[29]

Appellee has failed to prove that the state's prosecutorial gap was for the purpose of gaining a tactical advantage over appellee or for some other impermissible purpose, thus, appellee has failed to establish the second prong of the due-process analysis.

Appellee further argues that, even absent a showing of bad faith, "holding someone to answer for a crime that occurred over 23 years ago, and for which no limitations period exists, where the government cannot offer any reasonable basis for the delay whatsoever and where the person has suffered actual, substantial prejudice," violates that person's Fifth Amendment right to due process of law as it offends "fundamental conceptions of justice . . . which define the community's sense of fair play and decency."[30]  We do not contend that a 23-year, non-investigative pre-indictment delay,

---

[28] *Id.* at 792-793 (such a requirement would cause problems in criminal transactions involving more than one person or illegal act, would impair prosecutor's ability to continue an investigation, would cause multiple trials involving a single set of facts, and would burden defendants, law-enforcement officials, and courts.  Prosecutors would often resolve doubtful cases in favor of early, possibly unwarranted, prosecution).

[29] *See id.* at 791-792 ("To impose such a duty 'would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself.'  From the perspective of potential defendants, requiring prosecutions to commence when probable cause is established is undesirable because it would increase the likelihood of unwarranted charges being filed, and would add to the time during which defendants stand accused but untried.  These costs are by no means insubstantial since, as we recognized in *Marion*, a formal accusation may 'interfere with the defendant's liberty, . . . disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family, and his friends.' From the perspective of law enforcement officials, a requirement of immediate prosecution upon probable cause is equally unacceptable because it could make obtaining proof of guilt beyond a reasonable doubt impossible by causing potentially fruitful sources of information to evaporate before they are full exploited.  And from the standpoint of the courts, such a requirement is unwise because it would cause scarce resources to be consumed on cases that prove to be insubstantial, or that involve only some of the responsible parties or some of the criminal acts.  Thus, no one's interests would be well served by compelling prosecutors to initiate prosecutions as soon as they are legally entitled to do so") (citations and footnotes omitted).

[30] *Id.* at 790.

during which no new evidence is obtained, need not be scrutinized more closely than a similar delay for investigatory purposes. The Supreme Court has drawn a distinction between prosecutorial delays for investigatory purposes and delays for the purpose of gaining a tactical advantage over the accused, emphasizing the need not to penalize prosecutors who delay action for the purpose of procuring additional evidence.[31] However, absent proof of an improper purpose, the simple fact that a lengthy delay has occurred for no other reason than a difference of opinions amongst prosecutors does not violate due process.

> Judges are not free, in defining "due process," to impose on law enforcement officials our "personal and private notions" of fairness and to "disregard the limits that bind judges in their judicial function." Our task is more circumscribed. We are to determine only whether the action complained of–here, compelling respondent to stand trial after the Government delayed indictment to investigate further–violates those "fundamental conceptions of justice which lie at the base of our civil and political institutions," . . . and which define "the community's sense of fair play and decency."[32]

For the offense of murder, the Texas legislature has intentionally chosen not to define a statute of limitations,[33] explicitly allowing prosecutors to indict suspected murderers when they are ready to do so, and has determined that any such delay, without more, does not offend the community's sense of fair play and decency. While lengthy delays in prosecution will undoubtedly prejudice the accused, the "real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost,"[34] is not, in itself, enough

---

[31] *See Ibarra*, at 194; *Lovasco*, at 795.

[32] *Lovasco*, at 790 (citations omitted).

[33] TEX. CODE CRIM. PROC. art. 12.01(1)(A).

[34] *United States v. Marion*, 404 U.S. at 325-326 (1971).

to justify the dismissal of an indictment.[35]  Therefore, we find that a 23-year pre-indictment delay does not offend due process.

## Conclusion

We overrule appellee's sole ground for review, affirm the judgment of the court of appeals, and remand the cause to the trial court for further proceedings.

Delivered: December 14, 2011
Publish

---

[35]  Lengthy delay also has the potential to be detrimental to the state's prosecution, as its witnesses may also die, forget, or be unlocatable.