**Reversed and Remanded and Memorandum Opinion filed July 16, 2013.**



In The

# Fourteenth Court of Appeals

### NO. 14-12-00800-CR

### THE STATE OF TEXAS, Appellant

### V.

### OLLIE JAMES FORD, JR., Appellee

**On Appeal from the 177th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1268175**

## O P I N I O N

Appellee Ollie James Ford, Jr., was indicted on July 20, 2010, for the felony offense of aggravated sexual assault of a child that allegedly occurred on or about November 22, 1995. Appellee filed a motion to dismiss the indictment for prosecutorial delay of more than fourteen years between the alleged offense and the indictment. Following an evidentiary hearing, the trial court granted the motion to dismiss. The State of Texas now appeals the trial court's order dismissing the case. Because there is no evidence that the delay was used intentionally to gain a tactical advantage over appellee or for some other improper

purpose, we reverse the trial court's order and remand for further proceedings in accordance with this opinion.

## BACKGROUND

On July 20, 2010, a grand jury indicted appellee for the aggravated sexual assault of A.R. The sexual assault allegedly occurred on November 22, 1995, when A.R. was seven years old. After he was indicted, appellee filed a motion to dismiss the indictment, arguing that the State violated his due process rights when it waited more than fourteen years to indict him. *See* U.S. CONST. amend. V, XIV. Appellee also alleged that his right to a speedy trial had been violated. U.S. CONST. amend. VI; Tex. Const. art. I, § 10; Tex. Code Crim. Proc. Ann. art. 1.05 (West 2005). During the ensuing evidentiary hearing, five witnesses testified: two records clerks from local medical facilities, the two investigating Baytown police officers, and the former Harris County prosecutor who accepted charges in 2010.[1]

Baytown police officer Brian Thompson testified that he was assigned to the case in late December 1995, when he was a new detective, after Child Protective Services (C.P.S.) referred the case to the police. Thompson learned from the C.P.S. referral that A.R.'s aunt had observed blisters on A.R.'s lower back and rectum area and had taken her to San Jacinto Methodist Hospital as a result. A.R. was diagnosed with syphilis. Thompson also learned that A.R. had reported being sexually abused by people either living in or visiting her mother's house.

In early January 1996, Thompson travelled to Wallisville where he initially met with A.R. During that meeting, he presented A.R. with four separate photo

---

[1] The two records clerks who testified were from San Jacinto Methodist Hospital and Harris County Public Health and Environmental Services. Both testified they were unable to locate any records related to either A.R. or appellee for the 1995 to 1996 time period. The Harris County records clerk testified she did determine that a record for appellee had been opened in 1993 and closed in 1996, but the record itself had been purged and destroyed in March of 2001.

spreads that each included a photograph of a different male individual who had access to A.R.'s home on Elm Street in Baytown ("Elm Street House"): Toby Wright Moore, John Brinkley, Tony Cazares, and appellee. A.R. identified all four individuals as friends of the family. A.R. specifically identified Moore as her sister's boyfriend. She also told Thompson that neither Moore nor Brinkley had hurt her.

After she identified Cazares and appellee in the photo spreads, A.R. was referred to Texas Children's Hospital where she participated in a video forensic interview. Thompson testified he observed a portion of A.R.'s interview while it was occurring, and eventually viewed the complete interview on videotape. In the interview, A.R. disclosed that two people, Cazares and appellee, had sexually assaulted her by placing their sexual organs in her rectum. According to Thompson, Cazares was A.R.'s mother's boyfriend and lived in the Elm Street House with A.R. and her mother. Thompson also learned that appellee was a friend of Cazares and that he frequently visited the Elm Street House. In addition, Thompson learned that A.R. had reported the sexual abuse to her mother and her sister, but neither believed her.

Thompson continued his investigation by conducting interviews with some of the people A.R. identified as living in the Elm Street House. Thompson first interviewed A.R.'s mother. During that interview, she denied A.R. had told her that she had been sexually assaulted. Thompson also interviewed A.R.'s sister, who told Thompson she was not aware of any sexual abuse of A.R. Thompson then interviewed Brinkley, who denied any knowledge of sexual abuse occurring in the house. Finally, Thompson interviewed Cazares, who denied that he had sexually assaulted A.R.

All of the people associated with the Elm Street House agreed to be tested

3

for syphilis. Thompson testified that, with the exception of Brinkley, each person directly told him they had been tested for syphilis and the results were negative. Thompson testified that he learned the testing had been performed at the Harris County Health Clinic. Thompson then contacted the clinic by telephone and was told that the clinic does not obtain the patient's name but instead assigns a number to each patient. Thompson learned that a patient could obtain his or her test results only by using the assigned number. Thompson testified that, as a result of this telephone conversation, he assumed he could not obtain the testing records with the information that he had because the clinic did not keep the test results. Thompson admitted that he did not ask the people associated with the Elm Street House for their patient numbers nor did he ask the clinic if there was any way to substantiate their claims that they had been tested for syphilis and that the results were negative.

Thompson also made contact with C.P.S. worker Katie Deal as part of his investigation. According to Thompson, Deal forwarded medical confirmation that A.R. had syphilis. Thompson testified that Deal also told him that the Elm Street House residents had completed sexually-transmitted-disease testing and the test results would be forwarded to him. Thompson eventually learned that C.P.S. never obtained those test results.

In a second interview, A.R.'s mother told Thompson that she had heard that appellee "had slept with another young girl who was related to an individual who owned a balloon shop in Baytown." The balloon shop owner eventually told Thompson that he had contracted syphilis from appellee through anal intercourse.

Thompson finally talked to appellee on February 9, 1996. During the initial interview, appellee told Thompson he knew he was being accused of touching a little girl and giving her a sexually transmitted disease. Appellee denied the

4

accusation. According to Thompson, appellee then pulled out a card from the Houston Health Clinic. Appellee told Thompson that he had been tested. Thompson admitted during the hearing that he did not attempt to obtain any medical records related to appellee's alleged testing at the Houston Health Clinic. Thompson also admitted that he did not take possession of appellee's card or make a copy of the card. Thompson did ask appellee to come to the police station to give a statement, which appellee did later that same afternoon. Thompson was then asked where appellee's statement was presently located. Thompson admitted he did not know. Thompson also admitted that all of the statements he took as part of his investigation, and in fact his entire investigation file, were now missing.

On February 20, 1996, appellee returned to the police station where he took a polygraph examination. According to Thompson's police report, the polygraph examiner informed him that, in the examiner's opinion, appellee "had not been completely truthful with [Thompson] during [the] initial interview or in reference to the polygraph exam." The actual polygraph examination results are missing.

Thompson acknowledged during the hearing that appellee's polygraph examination was the last action he took in his investigation of the case. Thompson set the investigation aside at that point because he believed he had exhausted all investigative steps and still did not have enough evidence to arrest appellee.[2] Thompson's decision to set the investigation aside was based, at least in part, on his belief that he needed a corroborating witness.[3] Thompson denied that delaying

---

[2] Thompson did admit that, in hindsight and with the knowledge gained as a result of many years of experience, he believes he should have contacted the district attorney's office for guidance. Thompson also admitted that he now believes his 1996 investigation uncovered sufficient evidence to establish there was probable cause to arrest appellee at that time.

[3] Thompson believed he needed a corroborating witness because he was concerned about A.R.'s credibility. A.R. had talked during her video interview about events that Thompson learned had not actually occurred. Specifically, A.R. had mentioned that there had been a fire at

the case was an effort to punish appellee or to gain a tactical advantage over him, and testified instead that the decision resulted from his inexperience as a new detective in 1996. The case then sat dormant for seven years. On September 29, 2003, in response to pressure from his superiors to clear out old cases that were no longer being actively investigated, Thompson deactivated the case. When he deactivated the case, Thompson turned the entire file over to the Records Division for storage.

In early 2010, a now-adult A.R. contacted the Harris County District Attorney's office to inquire why her case had never been prosecuted. The District Attorney's office referred A.R. to the Baytown Police Department. A.R. spoke with Detective David Harrison at the Baytown Police Department. In response to A.R.'s call, Harrison reviewed A.R.'s forensic interview video, Thompson's original investigation police report, and he also spoke directly with Thompson about his investigation. Harrison asked Thompson about the lack of medical records attached to the case and Thompson said he had had trouble obtaining medical records from C.P.S. Harrison worked on the case between January 21 and June 24, 2010, without uncovering any evidence that was not known in 1996, when Thompson set the investigation aside. Harrison then presented the case to Darin Darby, a Harris County child-abuse prosecutor, who accepted charges because he believed there was probable cause to file the case against appellee.

At the conclusion of the evidentiary hearing, the trial judge provided an explanation for his decision to grant appellee's motion to dismiss. The judge determined that Thompson "intentionally stopped the investigation . . . at a point

---

the Elm Street House a few days before her interview and her brother had died in the fire. Thompson's concern grew out of the fact that A.R.'s mother denied there had been a fire at the Elm Street House and the mother's admission that she had had a second child, but had given that child up for adoption.

where he could have obtained [appellee's] test results that would have exculpated [appellee]." The judge also stated that he found not credible Thompson's testimony that Thompson did not believe he had probable cause in 1996. In particular, the judge stated that he did not believe Thompson's testimony was credible that he could not obtain the syphilis testing medical records because the clinics used numbers rather than names. The judge also made the following pronouncement:

> Thompson, although he stated he was presented with a card, he never goes any further than stating that he was presented with the card and specifically did not expand on that conversation, that [appellee] in handing him the card maintained his innocence and maintained that . . . the results were negative. I don't find that testimony at all credible either, or the lack thereof, I don't find that credible. I believe based on the testimony I heard that he was made fully aware not only that [appellee] had been tested, but that [appellee] had said, "I'm negative."

The trial judge then found that Thompson "intentionally fail[ing] to obtain the results of [appellee's] testing amounts to an actual and substantial prejudice to the Defense in this case."

The trial judge then turned his attention to Harrison. The judge found that "Harrison's testimony is completely void of any credibility, not deserving of any weight whatsoever." Finally, the judge stated that he found "the officers in this case did act in bad faith or intentionally in order to gain a tactical advantage over the defendant in order to secure formal charges and with the specific intent to obtain a conviction and a sentence in this case." No written findings of fact and conclusions of law were requested or signed in the case. This appeal followed.

## ANALYSIS

In a single issue on appeal, the State contends the trial court abused its

7

discretion when it granted appellee's motion to dismiss the indictment. The State goes on to argue that appellee failed to meet his burden to provide evidence that the "State intentionally delayed this prosecution to gain a tactical advantage." We agree with the State.

We apply a bifurcated standard of review when considering a trial court's decision to dismiss a case. *State v. Krizan-Wilson*, 354 S.W.3d 808, 815 (Tex. Crim. App. 2011). We give almost total deference to a trial court's findings of fact that are supported by the record, as well as any mixed questions of law and fact that rely upon the credibility of witnesses. *Id.* But when resolution of the case turns solely on questions of law or mixed questions that do not depend on credibility determinations, our review is de novo. *Id.*

Statutes of limitations are citizens' primary protection from prosecution for unduly stale criminal charges. *Ibarra v.* State, 11 S.W.3d 189, 193 (Tex. Crim. App. 1999) (citing *United States v. Marion*, 404 U.S. 307, 322 (1971)). There is no statute of limitations for the offense at issue in this case. Tex. Code Crim. Proc. Ann. art. 12.01(1)(B) (West 2005 & Supp. 2012). The Due Process Clause of the United States Constitution provides additional, if limited, protection of an accused from "oppressive delay." *Krizan-Wilson*, 354 S.W.3d at 814. Although we assess pre-indictment delay on a case-by-case basis, the Court of Criminal Appeals has instructed that proof of prejudice is a necessary but not sufficient element of a due-process claim, and that the due-process inquiry must consider the reasons for the delay. *Id.*

A defendant is entitled to relief for pre-indictment delay under the Due Process Clause when he can show the delay: (1) caused substantial prejudice to his right to a fair trial, and (2) was an intentional device used to gain a tactical advantage over the accused or for some other bad-faith purpose. *Id.* at 814–15

8

(citing *Ibarra*, 11 S.W.3d at 193). There must be proof of both elements. *Id.* at 814. In addition, because the State is not required to conduct a continuous investigation and is also not required to file charges as soon as probable cause exists but before the State is satisfied the State will be able to establish a suspect's guilt beyond a reasonable doubt, we may not infer bad faith from the existence of delay and prejudice. *Id.* at 814, 818–19. Appellee had the burden to prove that the State's delay was an intentional device used to gain a tactical advantage or for some other improper purpose. *Id.* at 816. It is not enough for appellee to argue that the trial court may have disbelieved each and every witness who testified that the State had no negative intentions for the delay; he was required to present positive proof of such improper purpose. *Id.*

Assuming without deciding appellee established the first element, we turn to the second. After a review of the record, which is summarized above, we conclude there is no evidence that the pre-indictment delay was intended to gain a tactical advantage over appellee or for some other bad-faith purpose. At most, appellee presented evidence that the pre-indictment delay was the result of inadequate police work by Thompson, an inexperienced detective in 1996, not an effort on his part to gain a tactical advantage or for some other improper purpose. *See State v. Krizan-Wilson*, 321 S.W.3d 619, 626 (Tex. App.—Houston [14th Dist.] 2010), *aff'd*, 354 S.W.3d 808 (Tex. Crim. App. 2011) (holding there was no evidence that the pre-indictment delay was intended to gain a tactical advantage or other improper purpose, but instead the only evidence indicated the delay was the result of a belief by investigators that the case was not winnable).

Our conclusion is supported by Thompson's decision to deactivate the case in 2003, two years after the evidence indicates the syphilis testing medical records had been destroyed. If Thompson's intent had been to prejudice appellee by

9

waiting for potentially favorable evidence to disappear, he would have reopened the case at that point, not deactivated it. Moreover, undisputed evidence establishes that the only reason the police reopened the investigation in 2010 was the complainant contacted the police to ask why no one had ever been prosecuted. The evidence is also undisputed that, once the case was reopened, there were no further delays in the investigation.

The trial judge's on-the-record explanation for his ruling does not change our analysis. Even if we disbelieve both investigating detectives' testimony that the investigation was not delayed for an improper purpose, this disbelief cannot substitute for positive evidence that the delay was for an improper purpose. *See Krizan-Wilson*, 354 S.W.3d at 816 ("It is not enough for appellee to argue that the trial court may have disbelieved each and every witness that testified that the state had no negative intention for the delay, appellee must still present positive proof of such an improper purpose."). The same principle applies if we disbelieve Thompson's testimony that he did not think he had probable cause to file charges in 1996, because there is no requirement that investigators must press charges as soon as they have probable cause. *Id.* at 819. With respect to Harrison's testimony, even though the trial judge found it devoid of credibility and it is undisputed that his investigation turned up no new evidence, there is still no positive proof that the delay was for an improper purpose. *See Krizan-Wilson*, 321 S.W.3d at 626 (holding that the fact a later prosecutor decided to pursue the case even though no new evidence had been revealed during the twenty-three year delay is not evidence of improper purpose). Finally, the trial judge's announced belief that Thompson was made fully aware not only that appellee had been tested, but also that the results of that test had been negative, cannot support the order of dismissal because there is no evidence in the record to support that belief. A

10

determination that Thompson was not a credible witness cannot create evidence. No such evidence is found in the record.

Because there is no evidence that the pre-indictment delay was used intentionally to gain a tactical advantage over appellee or for some other improper purpose, we hold the trial court erred in dismissing the indictment based on the delay.[4] *See Krizan-Wilson*, 354 S.W.3d at 819–20. We sustain the State's single issue on appeal.

## CONCLUSION

Having sustained the State's issue on appeal, we reverse the trial court's order of dismissal and remand for further proceedings in accordance with this opinion.

/s/    J. Brett Busby
         Justice

Panel consists of Justices Frost, Brown, and Busby.

Publish—Tex. R. App. P. 47.2(b).

---

[4] Appellee's motion to dismiss the indictment also included a ground asserting that his right to a speedy trial under the Sixth Amendment had been violated as a result of the fourteen-year pre-indictment delay. The trial court's order granted appellee's motion without specifying a ground. The State did not address the speedy-trial ground in its appellate brief and appellee did not file an appellate brief. We conclude the State was not obligated to address the speedy trial ground because the evidentiary hearing and the trial court's explanation of its ruling focused exclusively on appellee's Due Process Clause pre-indictment delay claim. *See State v. White*, 306 S.W.3d 753, 760 (Tex. Crim. App. 2010) ("Under these circumstances, the State could have reasonably concluded that the trial court's order granting White's motion to dismiss was based only on the constitutional guarantees of due process and due course of law. Given that fact, the State, on appeal, was not obligated to argue why the trial court's order could not have been proper under the Sixth Amendment speedy trial guarantee, and the court of appeals erred in holding otherwise."). Accordingly, we express no view on appellee's speedy-trial claim.

11