**Opinion issued December 17, 2020**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-19-00480-CR

_____

**EARL MCVAY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

On Appeal from County Court at Law No. 1
Galveston County, Texas
Trial Court Case No. MD-0374753

---

## MEMORANDUM OPINION

A jury convicted appellant, Earl McVay, of assault causing bodily injury to a family member. After appellant and the State reached an agreement regarding punishment, the trial court sentenced appellant to 365 days in county jail, fully probated, and a $500 fine. In two points of error, appellant contends that the trial

court erred in (1) denying his motion to dismiss the case for spoliation of possibly exculpatory evidence and (2) failing to instruct the jury on spoliation. We affirm.

## Background

On July 19, 2017, appellant was charged with assault causing bodily injury to a family member for hitting his live-in girlfriend, Johnnie Hubbard. Appellant pleaded not guilty, and the case proceeded to trial.

## A. Pretrial Hearing

Prior to voir dire, appellant requested that the trial court dismiss the case because a videotape of Hubbard giving her written statement to police was missing. After the jury was seated, the trial court conducted a pretrial hearing on appellant's motion to dismiss.

At the hearing, Leigh Scofield, the Sante Fe Police Department records clerk and communications supervisor, testified that the department follows the State policy requiring the retention of audio and video recordings of witnesses for a period of six months. Scofield testified that the offense report in this case did not reference a video.

Sante Fe Police Department Detective Brian Tandy investigated the case when he was a patrol officer. Tandy testified that he took a statement from Hubbard in the interview room regarding the alleged assault. He stated that the interview room has a built-in audio and video camera that is constantly recording. Tandy

2

testified that he talked to Hubbard first and then left the room while she wrote out her statement. Tandy further testified that Hubbard's written statement was a summary of their conversation. He stated that he did not know appellant personally, had had no personal dealings with him, and held no grudge against him.

Tandy testified that the detectives are in charge of making a DVD copy for any requested video and then placing the videotape into evidence in the case. Tandy stated that if detectives are not notified to download a particular video, then the entire tape is purged from the system in approximately fourteen to fifteen days. Tandy testified that, to download the video, he would have had to contact one of the detectives by email and notify them. Tandy testified that he never initiated the procedure to download the video of Hubbard and have it preserved for evidence. He further stated that he may not have requested preservation of the video because it was not required, and there was a written statement from Hubbard and photographs of her injuries. Tandy further testified that the department's six-month retention policy pertained to video evidence that has been recorded and saved. He stated that if he never requested the video be saved, it would have been recorded over in fourteen to fifteen days.

Tandy testified that, on the day before trial, he informed the prosecutor that he believed there was a video of Hubbard's interview because the equipment was constantly recording. However, he further testified that his report does not reflect

that he asked a detective to save the video, and that he would have documented in his report if the video had been downloaded and submitted into evidence.

At the conclusion of the hearing, appellant requested that the case be dismissed "based on spoliation of very important evidence." In response, the State argued that the video was not exculpatory evidence, only potentially useful evidence, and the fact that it was missing did not rise to the level of a due process violation. The State also argued that there was no evidence of bad faith on the part of the officer or the department in failing to preserve, or destroying, the video evidence. The trial court denied appellant's motion to dismiss, stating

> The Court finds that the defendant must show bad faith on the part of the police to establish failure to preserve the potentially useful evidence. And there is just no evidence of bad faith on the part of the police department. Also, the defendant must make some showing that the lost evidence was favorable and material; and we just don't know if the evidence was lost. First of all, we don't even know if it truly existed or if it was favorable and material. Therefore, I am going to deny the defendant's motion to dismiss.

## B.  Evidence Presented at Trial

On May 24, 2017, Tandy was out on patrol when he received a call to return to the police station to meet a complainant regarding a possible assault. Tandy testified that his first impression of Hubbard was that she was scared. He stated that Hubbard had a bruise on her face and a laceration on her arm. Tandy took photographs of Hubbard's injuries which he included in his report.

Tandy took Hubbard to the interview room and asked her what happened. Hubbard told him that appellant caused her injuries. After Hubbard gave a written statement, Tandy tried to call appellant multiple times over a two-week period to get his side of the story. After numerous unsuccessful attempts to reach appellant, Tandy moved forward with the case and filed a warrant.

On cross-examination, Tandy testified that he did not note his unsuccessful attempts to reach appellant in his offense report. He also stated that Hubbard did not tell him that appellant went out of town for work following the assault.

On re-direct examination, Tandy testified that Hubbard's written statement reflected what she told him in the interview room that day. On re-cross, Tandy stated that his notes from various cases were destroyed when his house flooded from Hurricane Harvey three months later.

Hubbard testified that, in May 2017, she and appellant had been living together on and off for five years and were re-engaged to be married. On May 23, Hubbard came home after work and fell asleep. Hubbard testified that, shortly before 1:00 a.m. on May 24, she woke up when appellant confronted her about a text message on her phone from Jesse DeLeon. Hubbard testified when she told appellant that she was not cheating on him and that Deleon had texted her to congratulate her on her engagement, appellant screamed at her and called her a liar. She testified that appellant then threw her phone at her, striking her on the arm, and

5

slapped her across the face with his open hand, which caused her to have hearing difficulty for a month. Hubbard testified that she was very scared. She stated that when she went to the bedroom, appellant told her that she could not sleep in there, so she went to the couch. Appellant tried to pour Hubbard's glass of tea on her but missed because he was intoxicated. Hubbard stated that when appellant passed out on the couch, she went into the bedroom.

The next day, Hubbard began gathering her belongings to go stay with her daughter. Hubbard left the house at 2:00 p.m. and went directly to the police station. Hubbard testified that she spoke with a police officer who took her statement and pictures of her injuries. Hubbard then went to the emergency room to have her ear examined. Hubbard testified that she had not drunk alcohol on the night of May 23, but that she was taking prescribed medications at the time—Vicodin, Xanax, and Soma—and that she had taken them that day as well as a couple of extra muscle relaxants before she fell asleep. Hubbard testified that she needed the medication to be able to sleep. Hubbard further testified that, after she completed rehabilitation, she called appellant to let him know that she had forgiven him.

On cross-examination, Hubbard testified that she had taken four or five Somas and two Xanax on the day of the assault. She stated that she subsequently went to rehabilitation for abusing those medications. Hubbard admitted that she became upset when appellant grabbed her phone that night, but she stated that she "was more

6

crying upset, not pissed off." Hubbard denied touching appellant on the night of the assault.

Appellant testified that when he got home from work on May 23, Hubbard was sleeping on the couch with her phone on her shoulder. When appellant saw Hubbard's phone light up with a text message, he looked at it and saw a message from Jesse DeLeon. Appellant testified that he had heard of DeLeon three months earlier and thought Hubbard was not going to talk to him anymore. Appellant testified that when he confronted Hubbard about the text, she became mad. Appellant stated that Hubbard handed him her phone but deleted DeLeon's messages. Appellant further testified that Hubbard demanded that he give her phone back to her and tried to knock the phone out of his hand as she hit him. Appellant denied throwing the phone at Hubbard and claimed that Hubbard was the first aggressor, but he admitted that he slapped Hubbard. Appellant testified that he went to Florida on May 25 for work and was gone for about three-and-a-half weeks.

At the conclusion of trial, the jury found appellant guilty of the charged offense. Appellant and the State reached an agreement as to punishment, and the trial court sentenced appellant to 365 days in county jail, probated, and a $500 fine. This appeal followed.

**Motion to Dismiss**

In his first point of error, appellant contends that the trial court erred in denying his motion to dismiss. He argues that the loss of potentially useful evidence was due to a systematic policy of destroying videotaped interviews of witnesses to which *Arizona v. Youngblood*, 488 U.S. 51 (1988) should not apply.

**A.    Standard of Review**

When reviewing a trial court's decision on a motion to dismiss, we apply a bifurcated standard, giving almost total deference to the trial court's findings of fact that are supported by the record, as well as any mixed questions of law and fact that rely upon the credibility of witnesses. *See State v. Krizan–Wilson*, 354 S.W.3d 808, 815 (Tex. Crim. App. 2011); *Tope v. State*, 429 S.W.3d 75, 79 (Tex. App.—Houston [1st Dist.] 2014, no pet.). For pure questions of law or mixed questions that do not depend on credibility determinations, our review is de novo. *See Krizan–Wilson*, 354 S.W.3d at 815.

**B.    Applicable Law**

Spoliation concerns the loss or destruction of evidence. *Guzman v. State*, 539 S.W.3d 394, 401 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (citing *Torres v. State*, 371 S.W.3d 317, 319 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd)). In addressing the failure to preserve evidence in a criminal trial, there is a distinction between "material exculpatory evidence" and "potentially useful evidence."

*Youngblood*, 488 U.S. at 57–58; *Ex parte Napper*, 322 S.W.3d 202, 229 (Tex. Crim. App. 2010). That difference informs our analysis when deciding whether the State's failure to disclose or preserve evidence violates a defendant's guarantee of due process of law. *See Illinois v. Fisher*, 540 U.S. 544, 547–48 (2004) (per curiam).

With material exculpatory evidence, a due process violation occurs whenever the State suppresses or fails to disclose such evidence, regardless of whether the State acted in bad faith. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). A *Brady* claim requires proof that the sought-after evidence was both material and favorable to the defendant such that there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different. *Pena v. State*, 353 S.W.3d 797, 809 (Tex. Crim. App. 2011). However, with potentially useful evidence, the State's failure to preserve such evidence does not amount to a due process violation unless the defendant can show bad faith on the part of the State. *See Youngblood*, 488 U.S. at 58. Potentially useful evidence is "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Id.* at 57. The Court of Criminal Appeals has held that *Youngblood*, and not *Brady*, is properly applied in cases in which the government no longer possesses the disputed evidence. *Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999); *see Moody v. State*, 551 S.W.2d 167, 170–71 (Tex. App.—Fort Worth 2017, no pet.) ("Although courts occasionally

9

blur the distinction between *Youngblood* and *Brady*, *Youngblood* is properly applied to cases in which the government no longer possesses the disputed evidence, whereas *Brady* is properly applied to cases in which exculpatory evidence remains in the government's possession.").

## C.    Analysis

Appellant does not argue that the videotape of Hubbard's statement to Tandy was material exculpatory evidence.  Tandy testified that the written statement reflected what Hubbard said during the interview.  Instead, appellant contends that the trial court erred in not ordering dismissal of the case "because the loss of potentially useful evidence was due to a systematic policy of destroying videotaped interviews of witnesses."

To satisfy the standard enunciated in *Youngblood* involving the destruction of potentially useful evidence, appellant had the burden to demonstrate that the State and law enforcement acted in bad faith by failing to preserve the video of Hubbard's interview.  *See Youngblood*, 488 U.S. at 58 ("We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.").[1]

---

[1]    Appellant urges us to find that *Youngblood*'s bad faith requirement does not apply under these circumstances because a defendant will almost never be able to show bad faith when a systematic policy, rather than an individual officer's decision, is at issue.  Appellant has not cited any cases which support his position, nor are we aware of any.  We decline appellant's invitation to depart from *Youngblood*.

"Bad faith" is more than being aware that one's action or inaction could result in the loss of evidence. *See Napper*, 322 S.W.3d at 238. "[B]ad faith entails some sort of improper motive, such as personal animus against the defendant or a desire to prevent the defendant from obtaining evidence that might be useful." *Id.* A showing of negligence does not qualify as bad faith. *See Youngblood*, 488 U.S. at 58. Requiring a defendant to show bad faith on the part of the State limits the State's requirement to preserve evidence to reasonable bounds and confines it to the class of cases where the police themselves, by their conduct, indicate the evidence could form the basis for exonerating the defendant. *See id.*

Appellant contends that the evidence presented at the pretrial hearing showed that the Santa Fe Police Department adopted a policy which contemplated the destruction of potentially important evidence within two weeks after the recording was made. Appellant argues that the department's policy does not conform to "state of the art" standards as evidenced by Scofield's testimony that the State of Texas's guideline for preservation of evidence mandates that evidence should not be destroyed for six months. Appellant asserts that "a systematic destruction of evidence, implemented as a matter of agency policy, is not 'mere negligence.'"

---

See *Purchase v. State*, 84 S.W.3d 696, 701 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) ("As an intermediate court of appeals we are bound by the decisions of our state's highest criminal court.").

Appellant mischaracterizes the evidence. Tandy testified that the video equipment is "built in" to the interview room and always recording. He testified that he told prosecutors shortly before trial that he believed there was a video because he knew the equipment was constantly recording. Tandy stated that he would have had to contact one of the detectives by email and notify them in order to download the video, but that he never initiated the procedure to download the video of Hubbard and have it preserved for evidence. Tandy stated that if detectives are not notified to download a particular video, then the entire tape is purged from the system in approximately fourteen to fifteen days. He further stated that he may not have requested preservation of the video because it was not required, and there was a written statement from Hubbard and photographs of her injuries. He also stated that he did not remember what happened to the videotape. Tandy further testified that the department's six-month retention policy was applicable only to video evidence that has been recorded and saved. He testified that the interview room is used for "so many things that we can't keep every recording that was made in there." *See Napper*, 322 S.W.3d at 238 ("Bad faith cannot be established by showing simply that the [State] destroyed the evidence without thought, or did so because that was the common practice, or did so because the [State] believed unreasonably that [it] was following the proper procedure.").

The evidence establishes that the Sante Fe Police Department had a policy in place which allowed the detectives a certain number of days to collect videotape from the continuously recording equipment if it had evidentiary value. *See Zapata v. State*, 449 S.W.3d 220, 229 (Tex. App.—San Antonio 2014, no pet.) (rejecting argument that State's destruction of evidence pursuant to record retention policy amounted to per se due process violation). A policy requiring the department to preserve every video ever taken would be at odds with the purpose of the bad faith requirement, which is to limit the State's obligation to preserve evidence "to reasonable grounds" and only in those cases "where the interests of justice most clearly require it." *Burdick v. State*, 474 S.W.3d 17, 27 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (quoting *Fisher*, 540 U.S. at 548) (citing *Youngblood*, 488 U.S. at 58) (concluding courts should avoid construction of Due Process Clause that might "impos[e] on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution"). Further, Tandy testified that Hubbard's written statement, which was available to appellant at trial, was a summary of the conversation which would presumably have been recorded on the video footage. Tandy also testified that he did not know appellant personally, had had no personal dealings with him, and held no grudge against him. *See Napper*, 322 S.W.3d at 238 ("[B]ad faith entails some sort of improper motive, such as personal animus against the defendant or a

desire to prevent the defendant from obtaining evidence that might be useful.").
Appellant has presented no evidence establishing that the State or law enforcement
failed to preserve the footage in bad faith. The trial court did not err by denying
appellant's motion to dismiss. We overrule appellant's first point of error.

## Spoliation Instruction

In his second point of error, appellant contends that the trial court erred in
failing to instruct the jury on spoliation.

## A. Applicable Law and Standard of Review

A review of jury charge error involves a two-step analysis. *Ngo v. State*, 175
S.W.3d 738, 743–44 (Tex. Crim. App. 2005); *Abdnor v. State*, 871 S.W.2d 726,
731–32 (Tex. Crim. App. 1994). First, we must determine whether error actually
exists in the charge, and, second, if error does exist, whether sufficient harm resulted
from the error to require reversal. *Ngo*, 175 S.W.3d at 743–44; *Abdnor*, 871 S.W.2d
at 731–32. When, as here, the defendant does not object to the jury charge, we will
not reverse for jury charge error unless the record shows "egregious harm" to the
defendant. *See Ngo*, 175 S.W.3d at 743–44. Errors that result in egregious harm are
those that affect "the very basis of the case," "deprive the defendant of a valuable
right," or "vitally affect a defensive theory." *Id.* at 750. We review a trial court's
decision not to submit an instruction in the jury charge for an abuse of
discretion. *Guzman*, 539 S.W.3d at 400.

**B.      Analysis**

A defendant seeking a spoliation instruction bears the burden of establishing that the State or law enforcement lost or destroyed the evidence in bad faith. *See id.* at 401 (citing *Napper*, 322 S.W.3d at 229).

As discussed above, appellant failed to show that the video footage of Hubbard's interview was purged in bad faith. Tandy stated that if detectives are not notified to download a particular video, the entire tape is purged from the system in approximately fourteen to fifteen days. Tandy testified that he did not request that the video be downloaded because it was not required, and he had Hubbard's written statement as well as photographs of her injuries. He also testified that he did not know appellant personally or hold a grudge against him. This evidence does not establish bad faith or a due process violation on the part of the State or the police. *See Youngblood*, 488 U.S. at 58; *Napper*, 322 S.W.3d at 238; *see also Arthur v. State*, No. 05-18-00075-CR, 2019 WL 3729499, at *9 (Tex. App.—Dallas Aug. 7, 2019, no pet.) (mem. op., not designated for publication) (concluding that trial court did not err when it denied defendant's request for spoliation instruction where officer testified that he did not seize paperwork in back of defendant's vehicle or separately inventory each document because there was no need to take documents and detective stated that it was not customary to separately list every document in vehicle due to time constraints); *Nichols v. State*, No. 02-17-00147-CR, 2018 WL

1865880, at \*6 (Tex. App.—Fort Worth Apr. 19, 2018, pet. ref'd) (mem. op., not designated for publication) (concluding record did not establish officer acted in bad faith in failing to preserve text message exchange where she testified that she commonly deleted data from her phone related to her investigations, and defendant did not produce any evidence that deletion of data from undercover officers' phones is not standard practice or that officer harbored any personal animus toward her); *Sobel v. State*, No. 09-14-00426-CR, 2015 WL 9311723, at \*4 (Tex. App.— Beaumont Dec. 23, 2015, no pet.) (mem. op., not designated for publication) (concluding record did not demonstrate improper motive, personal animus against defendant, or intention to prevent defendant from obtaining potentially useful evidence, and defendant identified no such evidence, where officer's testimony showed surveillance video was destroyed pursuant to store's common practice of erasing video after ninety days).  Further, there is no indication that the complained-of evidence was potentially exculpatory or useful to appellant.  *See Guzman*, 539 S.W.3d at 402.

Accordingly, we hold that the trial court did not abuse its discretion in failing to instruct the jury on spoliation.  *See Torres v. State*, 371 S.W.3d 317, 320 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd) (concluding spoliation instruction not required where defendant failed to establish potentially useful evidence destroyed in bad faith).  We overrule appellant's second point of error.

## Conclusion

We affirm the trial court's judgment.

Russell Lloyd
Justice

Panel consists of Justices Keyes, Lloyd, and Landau.

Do not publish.   TEX. R. APP. P. 47.2(b).