**Affirmed as Modified; Opinion Filed July 21, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-00417-CR

### GEORGE WASHINGTON HICKS, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 363rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F11-00837-W**

## MEMORANDUM OPINION
Before Justices Myers, Evans, and Brown
Opinion by Justice Evans

George Washington Hicks appeals his conviction for murder and asserts thirteen issues.

Appellant asserts the trial court erred by overruling his: (1) three *Batson* challenges (issues 1-3);

(2) motions to dismiss due to a violation of his right to speedy trial and due process (issues 4-5);

(3) motion to dismiss the indictment in the case on grounds it is barred by the doctrine of laches

(issue 6); (4) plea of res judicata and collateral estoppel (issue 7); (5) objections to identification

testimony (issue 8); (6) objection to the testimony of the medical examiner (issue 9); and (7)

objection to the jury argument (issue 11). Appellant also argues that the trial court erred in

denying his motion for mistrial (issue 10). Finally, appellant asserts that the evidence is legally

insufficient (issue 12) and the judgment does not properly reflect defendant's back-time credit

(issue 13). We modify the judgment with respect to back-time credit and affirm the judgment as modified.

## I. BACKGROUND

Before noon on December 23, 1981, a mother, Roxanne Jeeves, and her five-year old son, Kristopher Korper, were murdered in a field in Mesquite. Both mother and son were shot in the head. Deputy Sheriff James Cron, a lieutenant in the physical evidence section, photographed the crime scene and recovered a white knit hat and a knife from the crime scene. Deputy Sheriff Cron found the keys to Jeeves's car and located latent prints on the front passenger window. A blue bag on the front seat of the car contained a black knit hat with a pin in it saying "Super Shit," duct tape, live ammunition, a small vanilla extract bottle and an antique revolver holster. He also collected hairs from inside the black knit hat and some cigarette butts from the car. A small notebook with the name E. Oden in it was also found in the car. Jeeves's purse and a toy were located in the backseat. No firearm was recovered.

In March 2001, hairs recovered from the blue bag were submitted for DNA testing and comparison to CODIS (Combined DNA Index System). There was a hit in the CODIS database. The DNA profile from the hairs matched appellant's DNA. In addition, the DNA on one of the cigarette butts found in Jeeves's car matched the DNA on the hairs from the knit cap. At the time of this discovery, appellant was serving time with the Texas Department of Criminal Justice.

In 2001, the police also interviewed appellant's wife and her brother (Joseph McGary) and son (Derrick McGary). The brother and son both lived with appellant at the time of the double murders in December 2001. The brother and son identified the blue bag found in Jeeves's car as belonging to appellant.

On April 29, 2003, appellant was indicted for the murders of Jeeves (Cause No. F03-21910) and Korper (Cause No. F03-21911). In 2006, the rape kit collected from Jeeves was compared to appellant's DNA profile and there was a match. On January 22, 2007, the State elected to proceed only with Jeeves's case and appellant was tried for her murder. The jury found appellant guilty of murder and the trial court sentenced him to life in prison. The trial court further ruled that the life sentence would run consecutively to the 80-year sentence appellant had received for aggravated sexual assault in 1994. In February 2007, the State dismissed Korper's murder case (Cause No. F03-21911) for the following reasons:

> As a result of the Defendant now serving two long consecutive sentences, any sentence imposed in this case would not in all probability increase the time he is presently serving. As a result, prosecution of this case at this time cannot be justified. In addition, in order to eliminate the overcrowded condition of this Honorable Court's docket and to best serve the interests of the citizens of Dallas County through the most efficient use of judicial and prosecutorial manpower, the District Attorney's Office believes this case should be dismissed without prejudice.

In December 2011, appellant was re-indicted for Korper's murder. The indictment charged that appellant had intentionally or knowingly caused Korper's death or had intended to cause serious bodily injury by "shooting the said Kristopher Korper with a deadly weapon, to-wit: a firearm."

On March 24, 2014, appellant entered a plea of not guilty as to the charge of murder. The State presented over twenty witnesses during appellant's murder trial. Roy Baird and James Cron, retired officers from the Dallas Sheriff's Office, testified about the crime scene and what items were recovered. Dr. Jeffrey Barnard, the chief medical examiner for Dallas County, examined the autopsy photographs and concluded that the victim's cause of death was a gunshot wound to the right forehead area. Dr. Barnard noted that there was gunpowder marking the victim's skin surface which means the barrel tip was close enough to the victim when it was discharged that the gunpowder struck the skin surface.

Larry Forsyth, a former detective for the Dallas Sheriff's Office, worked on this case and testified that he had recovered a Texaco receipt from the car. Detective Forsyth spoke with a gas station attendant who stated that Jeeves was driving the car with an African-American man in the front seat and a child in the backseat around 9:30 am or 10:00 am on the day of the murders. In 2001, Detective Forsyth submitted the hairs from the knit cap into CODIS and the DNA in the hairs matched appellant's DNA. Deputy Sheriff Lieutenant Howard Sparks of the Dallas County Sheriff's Office also worked on this case and testified at trial. He noted that the "E. Oden" notebook found at the murder scene belonged to Eugene Oden who worked at an office building where appellant performed cleaning services.

Numerous employees of SWIFS (Southwestern Institute of Forensic Sciences) testified at trial including Joe Paredez, Tim Fallon, Benita Boyd, and Charles Clow. Paredez, as a former autopsy assistant, testified that samples and slides for a rape kit were prepared during Jeeves's autopsy. Fallon, a trace evidence analyst, testified that it was his job to examine hairs, fibers, chemical residues, gunshot residues and other items for criminal and civil investigations. He testified that the small bottle of liquid recovered at the crime scene was ethyl ether and water which could be used as an anesthetic. Boyd, a forensic serologist, testified that as a former employee of SWIFS that it was her job to identify and classify blood and body fluids as well as evidence from a rape kit collected during an autopsy. Boyd testified she examined swabs and smears from the Jeeves autopsy and located the presence of seminal fluid and acid phosphatase. Clow, a former SWIFS employee, testified about his 2006 testing of the three lead fragments in the victim's case and the bullets from Jeeves's case. Clow concluded that the bullets were consistent with bullets coming from a .38 or .357-caliber firearm.

In addition, Lorna Beasley, a former employee of the Texas Department of Public Safety, testified about the DNA testing performed in this case. In 2002, her lab received a blood

specimen and buccal swabs and hair specimen from appellant. Appellant's blood specimen was compared to the root DNA from the hair recovered at the crime scene and it was concluded that appellant was the source of the hair. She testified that the probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 10.12 quintillion for Caucasians, 1 in 16.91 quintillion for African-Americans, and 1 in 2.011 quintillion for Hispanics. Beasley also testified that there was a partial profile on the cigarette butt from the crime scene and appellant's known DNA standard matched with the five loci that were present. The statistical weight of this evidence was 1 in 18,670 for Caucasian, 1 in 17,950 for African-Americans, and 1 in 28,010 for Hispanics. Beasley also analyzed the anal smear slides, the vaginal smear slides, and the anal swab from Jeeves's autopsy for the presence of spermatozoa. Beasley determined that the DNA profile from the sperm fraction of the anal swab was consistent with the DNA profile of appellant. The probability of selecting an unrelated person at random who could be the source of this DNA profile is approximately 1 in 94.25 sextillion for Caucasians, 1 in 28.66 sextillion for African-Americans, and 1 in 8.137 sextillions for Hispanics. Jennifer Smith, a DNA analyst with a private DNA testing laboratory, also testified about the testing she performed in this case on Jeeves's underwear and panty liner. Smith testified that she conducted seminal fluid testing on this item and she was able to match the DNA to appellant.

At trial, Derrick and Joseph McGary each identified the blue bag and brown holster recovered from Jeeves's car and testified that they belonged to appellant. Derrick testified that he had seen the blue bag in his mother's (appellant's former wife) room and that it contained a brown holster and revolver. Joseph McGary testified that he lived with his sister and appellant in 1981 and that when he was going through a closet in his sister's room he found a blue bag that contained a holster, gun, duct tape, and rope. Both Derrick and Joseph testified that appellant

often wore toboggan hats with pins with little sayings in them like the one recovered at the crime scene.

Patricia McAvey, Jeeves's next door neighbor, saw an African-American man holding Korper's hand at the apartment complex. Another witness—Tamera Tignor—was near the crime scene on the day of the murders to pick up her grandmother. She saw a "dark complexioned" man running across a field toward Cartwright Road on the morning of December 23, 1981. Connie Helms, who was visiting her father in the area of Lawson and Cartwright Roads on December 23, 1981, heard gunfire and then saw a man coming down the road. The man stopped at the house and asked for a drink of water and her father said no. He asked to use the phone and her father said no. Tignor described the man as a black man with full cheeks, buggy eyes, and unruly hair. She called the police after seeing the murders featured on Unsolved Mysteries and told the officer that she thought she could recognize the suspect. Tignor later identified appellant in a photo line-up.

On March 28, 2014, the jury found appellant guilty of murder and the trial court assessed punishment at life in prison. Appellant then filed this appeal.

## II. ANALYSIS

### A.  Peremptory Challenges:  Appellant's Batson Challenge to the State's Peremptory Strikes of Juror Nos. 27, 31 and 43 (Issues 1-3)

Appellant argues that the trial court erred in overruling his objections to the jury panel based on the State's misuse of its peremptory challenges. Appellant specifically challenged the State's peremptory strikes of three African-Americans, prospective jurors numbered 27, 31, and 43, as violating *Batson v. Kentucky,* 476 U.S. 79 (1986). Appellant is African-American.

When we review a trial court's ruling on a *Batson* challenge, we "should not overturn the trial court's resolution of the *Batson* issue unless [we] determine[] that the trial court's ruling was clearly erroneous." *Blackman v. State*, 414 S.W.3d 757, 765 (Tex. Crim. App. 2013) (citing

*Herron v. State*, 86 S.W.3d 621, 630 (Tex. Crim. App. 2002)); *see Davis v. State*, 329 S.W.3d 798, 815 (Tex. Crim. App. 2010) ("The trial court's determination is accorded great deference and will not be overturned on appeal unless it is clearly erroneous."). We review the entire record of voir dire, *see Blackman*, 414 S.W.3d at 765, and do so in the light most favorable to the trial court's ruling. *Davis*, 329 S.W.3d at 815. In a *Batson* hearing, "[t]he trial court is the sole judge of the credibility of the witnesses and may choose to believe or disbelieve all or any part of any witness' testimony." *Wiltz v. State*, 749 S.W.2d 519, 520 (Tex. App.—Houston [14th Dist.] 1988, no pet.). The Supreme Court has consistently recognized that credibility determinations of the trial court should be given great deference on appellate review. *See Batson*, 476 U.S. at 98 n.21 ("Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference.").

The first step of a *Batson* challenge begins when a challenger makes "a *prima facie* showing of racial discrimination in the state's exercise of its peremptory strikes." *Davis*, 329 S.W.3d at 815 (citing *Herron,* 86 S.W.3d at 630). Then, in the second step, the burden shifts to the party making the strikes to articulate race-neutral explanations for its strikes. *Id.* Once the party making the strikes has articulated race-neutral explanations, in the third step, the burden shifts back to the challenging party to show that the explanations are a pretext for discrimination. *Id.* The trial court must then determine whether the challenging party has carried its burden of proving discrimination. *Id.*

When a party challenges an opponent's strike on the basis of purposeful discrimination, if the trial court proceeds immediately to the second step by inquiring of the proponent whether he had a non-discriminatory purpose, a reviewing court is to assume that the opponent has satisfied his step-one obligation to make a prima facie case of purposeful discrimination and address only

the second and third steps. *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008). At the second step of the analysis, there is no fact-finding to be done. The trial court simply accepts the explanation for the strike at face value and determines whether it is a reasonably specific race-neutral reason. *See Purkett v. Elem*, 514 U.S. 765, 768 (1995). Unless a discriminatory intent is inherent in the explanation, the reasons offered will be deemed race neutral. *See id.*; *see also Fritz v. State*, 946 S.W.2d 844, 847 (Tex. Crim. App. 1997) (discriminatory intent inherent in reason for peremptory challenge that males under the age of thirty would identify with opponent). "Thus, it is only at step three 'that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination.'" *Guzman v. State*, 85 S.W.3d 242, 246 (Tex. Crim. App. 2002) (citing *Purkett*, 514 U.S. at 768).

Here, appellant challenged the State's striking of prospective jurors numbered 27, 31, and 43. Because the trial court immediately moved to step two, we assume the validity of appellant's initial challenges. *See Watkins*, 245 S.W.3d at 447. The State then gave reasonable, race-neutral reasons for its strikes. For prospective juror number 27, the State argued that (1) she would require more than one eyewitness as stated in the jury selection portion and (2) her husband had recently been prosecuted by the District Attorney's Office. For prospective juror number 31, the State noted her questionnaire answers included statements to the effect that: (1) she was "beyond displeased with her treatment" by a judge and (2) that the "entire system could not be fair and she doesn't believe in it." The State also noted that this prospective juror had a previous DWI conviction. Finally, the State argued that it struck prospective juror number 43 because she indicated on her questionnaire that she could not sit in judgment of another human being. In accordance with the second stage of a *Batson* challenge, the trial court merely accepted these proffered reasons as race-neutral, but did not determine whether they were persuasive. *Guzman*,

85 S.W.3d at 246 (citing *Purkett*, 514 U.S. at 768). Appellant did not make any further argument and the court overruled the challenges.

Thus, we are asked to decide whether the trial court clearly erred by failing to find that the State's proffered reasons were pretexts for race discrimination. The United States Supreme Court has identified several factors to be considered in assessing the striking party's true motives for a peremptory strike, including:

> • that the State exercised its peremptory challenges to eliminate a far greater proportion of the African–American veniremen than the non-African-American veniremen;
> • that the reasons the State asserted for eliminating the African–American veniremen in question appeared to apply equally well to many of the non-African-American veniremen whom the State did not challenge;
> • that the State utilized its option to shuffle the jury panels in a manner that supported an inference of race discrimination; and
> • that the State directed questions expressly designed to elicit grounds for peremptory challenges disproportionately, in a manner that suggested an intent to single out African–American veniremen for elimination.

*Watkins,* 245 S.W.3d at 448–49. Here, the State did not use its peremptory challenges to eliminate a far greater portion of African-American prospective jurors than non-African-American prospective jurors. During the hearing, the State noted as follows:

> The numbers in the breakdown that I see in the strike zone, which is the relevant zone for the Court to consider, there were four Hispanics in the strike zone. There were nine African-Americans in the strike zone. There were 17 Caucasians in the strike zone. And four Asian or Pacific Islanders in the strike zone. The State exercised zero out of four peremptory challenges on Hispanics. We struck three out of nine that are in the strike zone, not 22 out of the whole panel. Of the nine that are actually in the strike zone, we exercised three peremptory strikes, leaving six. We struck of the 17 Caucasians, five of them -- out of the 17. And then one of the Asian Pacific Islanders.

Further, the State eliminated non-African-American potential jurors for the same reasons that it eliminated African-American potential jurors. As discussed above, the State eliminated potential juror number 43 because she indicated on her questionnaire that she could not sit in judgment of

another human being. The State also noted during the *Batson* hearing that it struck potential juror number 28, a white female, for the same reason. Specifically, the State argued:

> And the reason that we struck [potential juror number 43] is because on her questionnaire she indicated that she could not sit in judgement [sic] of another human being. It is true that during voir dire she explained that what she really meant by that was that she had misgivings about the death penalty, but I struck Juror Number 43 for that reason, which is the same that I struck Juror Number 28 who is a white female who was similarly situated in the panel.

Appellant makes no argument nor do we have any evidence that the State either utilized its option to shuffle the jury panels in a manner that supported an inference of race discrimination or directed questions expressly designed to elicit grounds for peremptory challenges disproportionately and in a manner that suggests an intent to single out African–Americans for elimination. Thus, our review of the record supports the trial court's ruling and we cannot say the trial court clearly abused its discretion. Accordingly, we overrule appellant's first three issues.

### B. Motions to Dismiss: Appellant alleges violations of his right to speedy trial and due process and argues that the indictment is barred by doctrine of laches (Issues 4-6)

Appellant argues that the trial court erred in overruling his motions to dismiss based on violations of his right to speedy trial and due process. Appellant also argues that the trial court erred in overruling his motion to dismiss based on the doctrine of laches. We disagree.

The two murders occurred on December 23, 1981. Appellant was separately indicted for each murder on April 29, 2003. On January 22, 2007, appellant's attorney stated for the record that he was ready to try both cases. The State, however, elected to proceed with only the Jeeves case. The jury convicted appellant and he received a life sentence for Jeeves's murder. As appellant was already serving an eighty-year sentence for a prior crime, the judge ordered the life sentence to commence only after appellant had completed serving his sentence for the prior

crime. On February 14, 2007, the State filed a motion to dismiss the indictment for Korper's murder for the following reasons:

> As a result of the Defendant now serving two long consecutive sentences, any sentence imposed in this case would not in all probability increase the time he is presently serving. As a result, prosecution of this case at this time cannot be justified. In addition, in order to eliminate the overcrowded condition of this Honorable Court's docket and to best serve the interests of the citizens of Dallas County through the most efficient use of judicial and prosecutorial manpower, the District Attorney's Office believes this case should be dismissed without prejudice.

On December 21, 2011, appellant was re-indicted for Korper's murder. On March 8, 2012, appellant filed a handwritten motion to set aside indictment for denial of speedy trial but withdrew the motion later that month. Appellant then filed a speedy trial demand on September 4, 2012. On October 26, 2012, appellant filed a motion to dismiss the indictment with prejudice for denial of his right to a speedy trial. The State filed a response to this motion on October 29, 2012. On November 1, 2012, appellant filed a motion to dismiss the indictment for denial of his right to due process of law.

On November 1, 2012, the trial court held a hearing on these motions to dismiss. For purposes of the speedy trial allegation, appellant's counsel stated that appellant was only contesting the time period beginning on the date that appellant was ready to go to trial (January 22, 2007). The State called three witnesses: (1) Nancy Mulder, the former assistant district attorney who tried the Jeeves case; (2) Brandon Birmingham, the lead prosecutor with the district attorney's office in the Korper case; and (3) Layne Fulps, an investigator with the district attorney's office. Mulder testified that it was a tactical decision not to proceed with Korper's case. Mulder noted that Jeeves's case was the stronger case but if her case had resulted in a not guilty verdict or a hung jury, she wanted to be able to proceed with Korper's case. She also testified that she dismissed Korper's case because she thought appellant would die in prison, not because it would give her a tactical advantage over appellant. Birmingham testified that he had

been actively working on preparing the case for trial. Fulps testified that all of the witnesses from the 2007 trial had been located. Following the hearing, the trial court denied the motions to dismiss. Appellant's trial began on March 14, 2014. On March 25, 2014, appellant filed a motion to dismiss indictment based on the doctrine of laches. The court denied the motion.

### 1.    *Speedy Trial*

The Sixth Amendment of the United States Constitution provides in part, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial," thereby guaranteeing an accused the right to a speedy trial. U.S. CONST. amend. VI; *see Barker v. Wingo*, 407 U.S. 514, 515 (1972). This right was made applicable to state criminal prosecutions by the Due Process Clause of the Fourteenth Amendment. *See Klopfer v. North Carolina*, 386 U.S. 213, 223 (1967). If a violation of the speedy trial right is established, the only possible remedy is dismissal of the prosecution. *Dragoo v. State*, 96 S.W.3d 308, 313 (Tex. Crim. App. 2003). As dismissal is a radical remedy, the courts must apply the *Barker* balancing test with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed. *See Cantu v. State*, 253 S.W.3d 273, 281 (Tex. Crim. App. 2008) (en banc) The constitutional right is that of a speedy trial, not dismissal of the charges. *Id.*

The court must balance four factors when analyzing a speedy trial claim: (1) length of delay; (2) reason for delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. *Barker*, 407 U.S. at 530. While the State has the burden of justifying the length of delay, the defendant has the burden of proving the assertion of the right and showing prejudice. *See Cantu*, 253 S.W.3d at 280. The defendant's burden of proof on the two factors varies inversely with the State's degree of culpability. *Id.* The four factors must be considered together along with other relevant circumstances and the court must engage in a difficult and sensitive

balancing process in each case. *Id.* at 281. There is a bifurcated review of a trial court's ruling on a speedy trial claim—abuse of discretion standard for the factual components and a de novo standard for the legal components. *Id.* at 282. This means that we independently weigh and balance the *Barker* factors but we presume the trial court resolved any disputed fact issues in a manner that supports its ruling. *See Zamorano v. State*, 84 S.W.3d 643, 648 (Tex. Crim. App. 2002).

### a) Length of delay

Appellant argues various lengths of delay. In his motion to dismiss filed on October 26, 2012, appellant argued a length of delay between the first indictment (April 29, 2003) and the second indictment (December 21, 2011). At the hearing on the motion to dismiss, however, appellant's counsel stated that appellant was only contesting the time period beginning on the date that appellant was ready to go to trial (January 22, 2007). In his appellate brief, appellant again argues the length of time between the first and second indictments and cites *Dickey v. Florida*, 398 U.S. 30, 43 (1970) in support of the assertion that the speedy trial clause applies to intervals between separate indictments and between separate trials on the same charges. Appellant, however, fails to note that his citation refers to a passing reference made by Justice Brennan in a concurring opinion, not the opinion of the Supreme Court. Following the *Dickey* opinion, the Supreme Court clarified what amount of time may be considered in a speedy trial claim:

> Although delay prior to arrest or indictment may give rise to a due process claim under the Fifth Amendment, see *United States v. Lovasco*, 431 U.S. 783, 788-789, 97 S.Ct. 2044, 2047-48, 52 L.Ed.2d 752 (1977), or to a claim under any applicable statutes of limitations, no Sixth Amendment right to a speedy trial arises until charges are pending. Similarly, the Speedy Trial Clause has no application after the Government, acting in good faith, formally drops charges. Any undue delay after charges are dismissed, like any delay before charges are

–13–

filed, must be scrutinized under the Due Process Clause, not the Speedy Trial Clause.

*U.S. v. MacDonald*, 456 U.S. 1, 7 (1982). In making this holding, the Supreme Court noted that the primary purpose behind the Sixth Amendment right to a speedy trial is *not* to prevent prejudice to the defense caused by the passage of time. *Id.* at 8. Instead, the speedy trial guarantee is designed to minimize the possibility of lengthy incarceration prior to trial and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges. *Id.*

Here, the State formally dismissed the charges against appellant for Korper's murder on February 14, 2007. Accordingly, appellant cannot assert a length of delay from April 29, 2003 until December 21, 2011 under the speedy trial clause. Instead, the length of the delay is measured from the time the defendant is arrested or formally accused. *See Dragoo*, 96 S.W.3d at 313. In general, delay approaching one year is sufficient to trigger a speedy trial inquiry. *See Shaw v. State*, 117 S.W.3d 883, 889 (Tex. Crim. App. 2003). Here, appellant was indicted in this case on December 21, 2011, and his trial began on March 14, 2014. Accordingly, a delay of almost 27 months occurred between the appellant's indictment and his trial.[1] This delay was sufficient to trigger a speedy trial inquiry.

### b)   *Reason for delay*

The second factor involves the reason for the State's delay. When a court assesses this factor, different weights must be assigned to different reasons. *Barker*, 407 U.S. at 531. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. *Id.* A more neutral reason such as negligence or overcrowded courts

---

[1] Although appellant could also have raised the time period from the first indictment (April 23, 2003) through his dismissal in the first case (February 14, 2007), appellant did not specifically address this time period.

should be weighted less heavily and a valid reason—such as a missing witness—should serve to justify appropriate delay. *Id.*

In response, the State offered the following reasons for the delay in its October 29, 2012 response to appellant's motion to dismiss:[2]

> At the time of the defendant's December 21, 2011 indictment, thirty years had passed since the date of the offense. The prosecutor currently assigned to the case, Mr. Brandon Birmingham, is not the prosecutor who tried the defendant in 2007 for Roxann's [sic] murder. Mr. Birmingham has required a reasonable amount of time to review the District Attorney's file regarding the investigation into the 1981 double murder, review the eight volume transcript of the 2007 trial, ascertain the location of physical evidence, locate and interview witnesses, and evaluate the case in light of changes in the law since the 2007 trial. Mr. Birmingham has also had to prepare the District Attorney's file, which commands several drawers of a file cabinet, for discovery. To say that Mr. Birmingham has had a large volume of information to review, evaluate, organize, and prepare for trial would be an understatement.

In addition, the State noted that some of appellant's own actions could have delayed the trial. The State points out that, following the speedy trial hearing, appellant changed attorneys twice and filed motions for appointments of experts and investigators. Considering the age of the case and the size of the file, we conclude that the reasons for this delay were neither valid nor a deliberate attempt to hamper the defense, so we weigh the delay against the State but not heavily.

### c) *Defendant's assertion of right*

The defendant's assertion of his right to a speedy trial is entitled to strong evidentiary weight in determining whether he has been deprived of his right. *Barker,* 407 U.S. at 531–32. Failure to assert the right in a timely and persistent manner will make it difficult for a defendant to provide that he was denied a speedy trial. *Id.* at 529. Also, seeking a dismissal, rather than a trial, may attenuate the strength of a speedy trial claim. *Phillips v. State*, 650 S.W.2d 396, 401 (Tex. Crim. App. 1983).

---

[2] At the time of the State's response to the motion to dismiss, this case had been pending less than one year.

In this case, appellant was indicted for the second time on December 21, 2011. On March 8, 2012, appellant filed a handwritten motion to set aside the indictment for denial of speedy trial, but withdrew the motion later that month. Appellant then filed a speedy trial demand on September 4, 2012. On October 26, 2012, appellant filed a motion to dismiss the indictment with prejudice for denial of his right to a speedy trial. The court held a hearing on November 1, 2012, and denied appellant's motion. Following this hearing, the record lacks any reassertion by appellant to his speedy trial rights. Further, the record reflects that appellant filed an agreed motion for continuance on January 30, 2014. Appellant also filed a motion for continuance on March 20, 2014, which the court denied.

Appellant argues that he announced "ready" for trial of both cases in January 2007. As the State points out, however, announcing "ready for trial" is not the same as demanding a speedy trial. *See Henson v. State*, 407 S.W.3d 764, 769 (Tex. Crim. App. 2013) ("[Defendant] claims that announcing ready was such a demand. However, this is not a *demand* for a speedy trial; instead, it merely asserts that he could go to trial at that moment should the State push for it. A speedy-trial demand should be, at the very least, unambiguous."). In this case, the only unwithdrawn request for a speedy trial came on September 4, 2012. Shortly after filing the request, appellant filed a motion to dismiss indictment with prejudice for denial of his right to a speedy trial. However, after the trial court denied this motion, appellant did not reassert his request for a speedy trial. In fact, appellant subsequently agreed to one trial continuance and requested a second one. Based on these facts, we cannot say that appellant met his burden.

### d) *Prejudice to defendant*

Prejudice must be assessed in light of the interest a speedy trial is designed to protect. *Barker,* 407 U.S. at 532. These interests are as follows: (1) preventing oppressive pretrial incarceration; (2) minimizing anxiety and concern of the accused; and (3) limiting the possibility

that the defense will be impaired. *Id.* Of these three, the most serious is the last, because the inability of the defendant to prepare a defense skews the fairness of the entire system. *Id.* A defendant has the burden to make some showing of prejudice although a showing of actual prejudice is not required. *State v. Munoz,* 991 S.W.2d 818, 826 (Tex. Crim. App. 1999) (en banc). Further, when a defendant makes a prima facie showing of prejudice, the State carries the obligation of proving that the accused suffered no serious prejudice beyond that which result from the ordinary and inevitable delay. *Id.*

Here, the record reflects that appellant was incarcerated during the entirety of this case for previous convictions. Accordingly, appellant cannot demonstrate oppressive pretrial incarceration due to lack of a speedy trial. Further, appellant has not provided any evidence as to any anxiety or concern caused by this delay. As for how his defense has been impaired, appellant asserts two arguments. First, appellant argues that he was prejudiced because in December 2011, he was being considered for parole and the indictment in this case "sidelined" his potential parole. Appellant neither provides any record citations regarding his parole nor any legal citations as to how his loss of parole from an indictment results in prejudice under a speedy trial analysis. Second, appellant argues that his mother, Eva Hicks, would have been able to testify in January 2007 but she was subsequently diagnosed with Alzheimer's and then passed away in 2012. Appellant asserts that she was uniquely qualified to testify about the physical and sexual abuse suffered by appellant and he was prejudiced by her inability to testify at his 2014 trial. Appellant argues that the ability to present mitigation evidence in a murder case is an essential right. In support of his argument, appellant cites *Tennard v. Dretke,* 542 U.S. 274 (2004) and *Brewer v. Quarterman*, 550 U.S. 286 (2007). Neither of these cases is a speedy trial case. Instead, they are capital murder cases involving a defendant's right to have juries consider mitigating evidence in deciding whether to issue the death penalty. In this case, however,

appellant was not charged with capital murder. In addition, appellant fails to explain how his mother's testimony would have been relevant to his sentencing in this case. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (West Supp. 2014) ("Regardless of the plea and whether the punishment be assessed by the judge or the jury, evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried . . . ."). Further, we note that appellant does not address whether his mother testified at the Jeeves murder trial as a mitigating witness. In the State's Response and Objection to Defendant's Motion to Dismiss Indictment with Prejudice for Denial of Defendant's Constitutional Right to a Speedy Trial, however, the State noted that appellant "did not call his mother as a witness at his 2007 trial, at a time when, by his own admission, she was available and willing to testify." When appellant's counsel raised the mitigating witness argument at the motion to dismiss hearing, the State responded as follows:

> All of the State's witnesses are available to testify. The defense asked the investigator whether she -- whether he contacted any of the defense witnesses. The fact of the matter is, is that other than re-calling one witness for cross-examination, the defense did not put on any evidence -- any witnesses at the 2007 trial. Therefore, I think it would be very difficult for the defendant to say now that he has been prejudiced. He didn't call anybody back in 2007, five years ago. Even -- even his mother, he didn't call his mother at that 2007 trial.

Based on the arguments and evidence put forth by the parties, we conclude that the State met its burden to persuasively rebut the presumption of prejudice.

### e) *Balancing the factors*

Having addressed the four *Barker* factors, we now balance them. Although the first two factors weigh against the State, the second two factors weigh against the appellant. Having

reviewed the facts before us, we reach the same conclusion as the trial court that appellant's right to a speedy trial was not violated and overrule appellant's fourth point of error.

### *2. Due Process*

Appellant argues that the trial court erred in overruling his motion to dismiss based on violations of his right to due process. We disagree.

Although statutes of limitation are the primary guarantee used to protect citizens from stale criminal charges and charging delays, the Due Process Clause of the Fifth Amendment has a limited role to play in protecting against oppressive delay. *See State v. Krizan-Wilson*, 354 S.W.3d 808, 813–14 (Tex. Crim. App. 2011). In order to be entitled to relief, however, the defendant must demonstrate that the delay: (1) caused substantial prejudice to his right to a fair trial and (2) was an intentional device used to gain a tactical advantage over the accused. *Id.* at 814–15. There must be proof of both elements. *Id.* at 817; *State v. Ford*, 410 S.W.3d 341, 347 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

There is a bifurcated review of a trial court's decision to dismiss a case. *Krizan-Wilson*, 354 S.W.3d at 815. The court of appeals must give almost total deference to a trial court's findings of facts that are supported by the record, as well as mixed questions of law and fact that rely upon the credibility of a witness. *Id.* However, the court of appeals applies a *de novo* standard of review to pure questions of law and mixed questions that do not depend on credibility determinations. *Id.*

### *a) Substantial prejudice*

In his due process claim, appellant reasserts that he was prejudiced by the delay due to the loss of his mother and her inability to testify. For the reasons set for above in the speedy trial analysis, we conclude that appellant has failed to demonstrate substantial prejudice.

–19–

### b) *Tactical advantage*

A defendant has the burden to prove that the State's delay was an intentional device used to gain a tactical advantage or for some other improper purpose. *Ford*, 410 S.W.3d at 347. Appellant argues that the State only decided to re-indict appellant after the State found out he was eligible for parole and that the State derived a tactical advantage from the passage of time.

In the hearing on the motions to the dismiss, Nancy Mulder, the former Assistant District Attorney who tried the Jeeves case, testified for the State. Mulder testified that the decision not to proceed with Korper's case was not done to gain a tactical advantage over appellant from the passage of time. Instead, Mulder noted that she proceeded with Jeeves's case because it was the stronger case and she held Korper's case back in case the Jeeves case had resulted in a not guilty verdict or a hung jury. She also testified that she dismissed Korper's case because she thought appellant would die in prison. Following the hearing, the trial court made the following conclusions:

> With regard to severing in 2007, I take judicial notice that I think severing happens more often than not down here on a decision that the State makes more often than not to sever the cases, so I don't find anything unusual or any kind of bad faith with regard to them not trying both cases in 2007. With regard to due process, I do not find that the State's dismissal in 2007 was an intentional device to gain any tactical advantage, and the motion is denied.

Accordingly, it appears that the trial court believed Mulder's testimony and we defer to the trial court's finding of fact based on the credibility of a witness. *Krizan-Wilson*, 354 S.W.3d at 815. Thus, we affirm the trial court's denial of the motion to dismiss and overrule appellant's fifth issue.

### 3. *Laches*

Appellant argues the trial court erred in overruling his motion to dismiss based on the doctrine of laches. Specifically, appellant cites *Ex parte Perez* for the proposition that the equitable remedy of laches bars the State from prosecuting him for Korper's murder. 398

–20–

S.W.3d 206 (Tex. Crim. App. 2013). In *Ex parte Perez*, the court altered the parameters of the equitable doctrine of laches as it applies to bar a long-delayed application for a writ of habeas corpus. *Id.* at 208. Specifically, the court adopted the Texas common-law definition of the doctrine of laches and rejected its prior federal laches standard as stated in *Ex parte Carrio*, 992 S.W.2d 486 (Tex. Crim. App. 1999).

Both *Ex parte Perez* nor *Ex parte Carrio* are factually distinguishable from this case as neither involved any assertion of pre-indictment delay. The court of criminal appeals has previously rejected extending use of the doctrine of laches into the realm of pre-indictment delay:

> *Carrio* is not a pre-indictment delay case. In it, the court followed the federal practice of using laches to assess the consequences of delay in applications for writ of habeas corpus. *Id.* at 487. This is a very narrow use of this equitable doctrine. There is no suggestion in the opinion that the doctrine should apply in any other criminal context. We see no reason to extend use of the doctrine into the realm of pre-indictment delay, where the Court of Criminal Appeals has already set forth a test governing our analysis. *See Ibarra,* 11 S.W.3d at 193–94. For this reason, we find that the trial court erred in dismissing the indictment pursuant to the doctrine of laches.

*See State v. Krizan-Wilson*, 321 S.W.3d 619, 629 (Tex. App.—Houston [14th Dist.] 2010), *aff'd,* 354 S.W.3d 808 (Tex. Crim. App. 2011). Accordingly, we affirm the trial court's decision to deny the motion to dismiss and overrule appellant's sixth issue.

### C.    *Plea of Collateral Estoppel (Issue 7)*

Appellant argues that the trial court erred in overruling his plea of res judicata/collateral estoppel in regard to the allegation that he used or exhibited a deadly weapon. We disagree.

In 2003, appellant was indicted for the murder of the Jeeves. The indictment for that murder charged appellant as follows:

> intentionally and knowingly cause the death of ROXANNE JEEVES, an individual, by shooting the said ROXANNE JEEVES with a firearm, a deadly weapon,

–21–

> And unlawfully then and there intend to cause serious bodily injury to ROXANNE JEEVES and did then and there commit an act clearly dangerous to human life, to-wit: by shooting the said ROXANNE JEEVES with a firearm, a deadly weapon, and did thereby cause the death of ROXANNE JEEVES, an individual.

The jury charge provided that the appellant should be found guilty if he "intentionally or knowingly cause the death of ROXANN [sic] JEEVES, an individual, by shooting the said ROXANN [sic] JEEVES with a firearm, a deadly weapon." In January 2007, the jury convicted appellant and the verdict form specifically found appellant "guilty of the offense of murder, as charged in the indictment." When the judge set punishment, however, he did not include a finding that a deadly weapon was used or exhibited in the judgment. In this case, appellant's indictment also included a deadly weapon charge. The jury charge and the judgment also included a deadly weapon finding.

Appellant now argues that the trial court was collaterally estopped from making a deadly weapon finding in this case since no deadly weapon finding was made in the mother's case and the murders took place at the same time. Appellant, however, misconstrues the law. The jury in the Jeeves case convicted appellant "as charged in the indictment." As stated above, that indictment included a deadly weapon finding. When the trier of fact makes an affirmative finding that a deadly weapon was used, the trial court shall enter the finding in the judgment of the court. *See* TEX. CODE CRIM. PROC. ANN. art. 42.12, § 3g(a)(2) (West Supp. 2014) ("On an affirmative finding under this subdivision, the trial court shall enter the finding in the judgment of the court."); *McCallum v. State*, 311 S.W.3d 9, 19 (Tex. App.—San Antonio 2010, no pet.). It is clear from the facts above that (1) the jury, not the trial court, was the factfinder; (2) an affirmative finding was made; and (3) the trial court should have entered a deadly weapon finding in its judgment in the Jeeves case. Thus, by definition, collateral estoppel does not apply in this case. The Texas Court of Criminal Appeals has previously held that the "key to collateral

estoppel is that the *original* factfinder, whether judge or jury, has necessarily determined an essential fact." *Rollerson v. State*, 227 S.W.3d 718, 730 (Tex. Crim. App. 2007). Here, the jury, not the judge, determined the issue of the deadly weapon finding in the Jeeves case. Accordingly, we overrule appellant's seventh issue regarding collateral estoppel.

### D. Overly Suggestive Line Up (Issue 8)

Appellant argues that the trial court erred in overruling appellant's objections to the identification testimony due to an overly suggestive line-up. For the reasons discussed below, we disagree.

#### 1) Factual Background

The trial court held a pretrial hearing to address appellant's motion to suppress illegal identification of the defendant and request hearing outside the presence of the jury. During the hearing, Deputy Sparks testified that he developed appellant as a suspect in 2001 after appellant's DNA from the crime scene matched the appellant's DNA in CODIS. Deputy Sparks testified that he obtained a photograph of appellant and gathered additional photographs with the same tinting of men matching appellant's general description and age. A witness, Connie Helms, had previously contacted the police in the 1990's about a man she had seen walking down the street at the time of the murder. Deputy Sparks prepared the photographic lineup for Helms to review. On September 5, 2001, Deputy Sparks, his partner and the original detective from 1981, Larry Forsyth, went to see Connie Helms. The men asked Helms to view a photo lineup but did not offer any instruction other than if she recognized anyone. Helms identified appellant's photograph but noted that he was younger and had hair when she saw him. At that time, Deputy Sparks realized that he had placed a 1994 photograph of appellant in the lineup rather than the 1984 photograph. Detective Sparks then pulled out the 1984 photograph of

–23–

appellant and Helms said "that's him." Detective Sparks testified that he did not attempt to influence Helms's identification. The trial court denied the motion.

At trial, Detective Forsyth testified about the photographic lineup and noted that Helms went straight up to appellant's 1994 photograph and said "that's him, that's the man that walked up in my front yard" and "that's him, but he had more hair back then." Forsyth also testified that when she saw the 1984 photograph Helms stated "yes, that's him" and "oh, good, because I – I thought maybe I had picked the wrong man when y'all said you wanted to show me another picture." Forsyth noted that they never told Helms that they had a suspect in custody. Helms also testified at trial and she stated that she called the police because she felt like she "still had a picture of this man in my mind." Helms described the suspect as having full cheeks, buggy eyes, and unruly hair. She testified that she is one hundred percent sure that the man she saw in 1981 was the appellant.

### 2)      Standard and Analysis

The United States Supreme Court has held that a pre-trial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law. *Barley v. State*, 906 S.W.2d 27, 32–33 (Tex. Crim. App. 1995) (en banc) (citing *Stovall v. Denno,* 388 U.S. 293 (1967)). Thus, a two-step analysis was formulated to determine the admissibility of an in-court identification: 1) whether the out-of-court identification procedure was impermissibly suggestive, and 2) whether that suggestive procedure gave rise to a very substantial likelihood of irreparable misidentification. *Id.* at 33. These steps require an examination of the totality of the circumstances. *Id.*

In his brief, appellant generally asserts that photographic lineups should depict persons with sufficient similarity in appearance and of the same race, general skin color, age and height. Appellant also notes that the photographic lineups should contain photographs of persons based

on any description of the offender that a witness has given the police. Appellant does not, however, explain how this particular photographic lineup was unduly suggestive.[3] Based upon our review of the photographs submitted to Helms, the persons selected appear to be of the same race, general skin color, and approximate age. Further, even if appellant had argued a basis for why the lineup was suggestive, he would have had to show that the lineup was impermissibly suggestive by clear and convincing evidence. *Id.* at 33–34. Finally, appellant would have had to also demonstrate by clear and convincing evidence that the identification had been irreparably tainted. *Id.* For these reasons, appellant has not met his burden and we overrule this issue.

### E. Medical Examiner Testimony (Issue 9)

In his ninth issue, appellant argues that the trial court erred in allowing Dr. Barnard, the chief medical examiner for Dallas County, to give his expert opinion on the cause of death. Appellant contends that, under *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), the trial court violated his right to confront witnesses against him because Dr. Barnard neither performed nor was present during the autopsy. Essentially, appellant argues that Dr. Barnard was acting as a conduit expert for another expert's opinion. We disagree.

The Confrontation Clause of the Sixth Amendment, applicable to the states through the Fourteenth Amendment, provides that, "[i]n all criminal prosecutions, the accused shall [have the right] to be confronted with the witnesses against him." U.S. CONST. amend. VI; *see Pointer v. Texas,* 380 U.S. 400, 403 (1965). In *Crawford v. Washington,* 541 U.S. 36 (2004), the Supreme Court held that out-of-court testimonial evidence violates the Confrontation Clause unless the declarant is unavailable to testify and the defendant had a previous opportunity to cross-examine him. *Id.* at 68.

---

[3] Appellant directs the Court to pages 27–91 of the fourth volume of the reporter's record without any additional specificity. *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.").

In *Melendez-Diaz*, the court held that the admission of certificates of analysis, offered by the prosecution in a drug trial, stating that the material seized by police and connected to the defendant was cocaine of a certain quantity, violated the defendant's Sixth Amendment right to confront the witnesses against him. Specifically, the court found that the certificates of analysis were more appropriately described as affidavits and fell within the "core class of testimonial statements" covered by the Confrontation Clause. *Melendez–Diaz,* 557 U.S. at 310. The court reasoned that the certificates were sworn declarations of fact made for the purpose of establishing or proving some fact-namely, that the substance found was cocaine. *Id.* Accordingly, the affidavits were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* Because the analysts' affidavits were testimonial, the court found the analysts were witnesses for the purposes of the Sixth Amendment. *Id.* Therefore, unless the analysts were unavailable to testify at trial and the defendant had been afforded a prior opportunity to cross-examine them, the Confrontation Clause required that the prosecution call the analysts to testify. *Id.*

The Supreme Court explained nuances in its reasoning in *Bullcoming v. New Mexico, ——* U.S.——, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011) regarding "surrogate testimony" in the context of a driving while intoxicated case. In that case, the forensic analyst assigned to test Bullcoming's blood sample created and signed the "Report of Blood Alcohol Analysis." *See id.* at 2710. At trial, the State called a different analyst who was familiar with the laboratory testing procedure but did not participate in or observe the testing on Bullcoming's blood sample. *See id.* at 2709. The Court concluded the admission of the forensic analyst's report concerning blood alcohol concentration was a violation of Bullcoming's right to confrontation because a surrogate analyst, rather than the analyst who prepared the report, testified from the report and lacked an "independent opinion" of the DNA testing. *Id.* at 2715–16.

In a 2012 plurality opinion, however, the Supreme Court concluded the admission of expert testimony regarding the results of DNA testing performed by non-testifying analysts did not violate the Confrontation Clause. *See Williams v. Illinois,* —— U.S. ——, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012). In *Williams,* an expert witness relied on a DNA profile procured from a third-party laboratory, Cellmark, which had performed the DNA testing before a suspect was identified in the criminal investigation. *Id.* at 2227–28, 2234. The expert testified as to the following: Cellmark was an accredited lab; the Illinois state police lab occasionally sent forensic samples to Cellmark for DNA testing; the police lab sent vaginal swabs taken from the victim to Cellmark and later received those swabs back from Cellmark; and the Cellmark DNA profile matched a profile produced by the police lab from a sample of the defendant's blood. Because the witness had personal knowledge of each of these matters, the Court held that her testimony did not violate the Confrontation Clause. *Id.* at 2227–29.

Based on the holdings of the foregoing cases, it is clear that cloaking inadmissible testimonial hearsay as an expert opinion does not redeem the character of the evidence. However, that is not what occurred in this case. Here, Dr. Barnard testified that he formed an opinion independent of Dr. Charles Petty—the medical examiner who performed the autopsy— by looking at the photographs. Dr. Barnard noted that he could testify as to the cause of death solely based on the photographs: a gunshot wound to Korper's head indicated Korper died from being shot in the head. Thus, Dr. Barnard had personal knowledge of the facts and testified as to his own interpretation of the cause of death. Further, appellant's counsel cross-examined Dr. Barnard. Based upon our prior opinions and this set of facts, we cannot conclude that the trial court erred in admitting Dr. Barnard's testimony. *See Lightfoot v. State,* No. 05–12–00428, 2013 WL 3871041, at *5 (Tex. App.—Dallas 2013, pet. ref'd) ("Indeed, notwithstanding appellant's reliance on *Bullcoming,* this case is different from other recent cases where we followed

–27–

*Bullcoming* because, as the trial court pointed out, Fuller did not serve as a mere conduit for another technical supervisor's conclusions. Instead, she testified regarding what she independently observed and concluded—based [sic] her own experience and after reviewing the maintenance records and logs."); *Hernandez v. State,* No. 05–11–01300–CR, 2013 WL 1282260, at *6 (Tex. App.—Dallas 2013, pet. ref'd) (testimony of expert was not an "after-the-fact explanation" of non-testifying witness's opinion but "an explanation of his independent conclusion in the case."). Appellant's ninth issue is overruled.

### F.    Motion for Mistrial:  Contact with Jury (Issue 10)

Appellant argues that the trial court abused its discretion in denying appellant's motion for mistrial due to jury tampering.  We disagree.

The Texas Code of Criminal Procedure provides that "[n]o person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court."  TEX. CODE CRIM. PROC. ANN. art. 36.22 (West 2006).  A violation of Article 36.22, once proven by the defendant, triggers a rebuttable presumption of injury to the accused and a mistrial may be warranted.  *Ocon v. State,* 284 S.W.3d 880, 884 (Tex. Crim. App. 2009).  When determining whether the State sufficiently rebutted the presumption of harm, we view the evidence in the light most favorable to the trial court's ruling and defer to the trial court's resolution of historical facts and its determinations concerning credibility and demeanor.  *Id.*  A trial court's denial of a motion for mistrial is reviewed for an abuse of discretion.  *See Coble v. State,* 330 S.W.3d 253, 292 (Tex. Crim. App. 2010).  A mistrial is as an extreme remedy for prejudicial events occurring during the trial process and should be granted only when residual prejudice remains after less drastic alternatives are explored.  *Ocon,* 284 S.W.3d at 884.

In this case, Mr. Korper, the victim's father, approached one of the jurors on a break during the trial and asked what her number was.  The juror responded that she didn't know that

she had a number and that she was not allowed to give out any information. Mr. Korper then told the juror that he wanted the number of a different juror. The juror told Mr. Korper to speak with the bailiff and then she reported this interaction to the bailiff. The court then questioned both jurors and asked if they felt intimidated or threatened in any way. They both answered no. The court then asked if this interaction would affect their service as a juror. Both again answered no. As the conversation between the juror and the bailiff took place in front of the other jurors, the court then questioned the remaining jurors and asked if they were threatened or intimidated by what had occurred and whether it would affect their service. Each juror answered no.

Article 36.22 provides that "[n]o person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court." The communication at issue in this case may have constituted juror misconduct in violation of Article 36.22. A violation of Article 36.22, however, does not automatically warrant a mistrial. *See Ocon* at 885. Although it is generally presumed that a defendant is injured whenever an empaneled juror converses with an unauthorized person about a case, the defendant has the burden to establish that if a conversation did occur between a nonsequestered juror and someone else that the discussion involved matters concerning the specific case at trial. *See Chambliss v. State*, 647 S.W.2d 257, 265–66 (Tex. Crim. App. 1983) (en banc) (holding that defendant was not prejudiced by conversation during break in trial between one of the jurors and the victim's sister because record did not show that defendant's case was discussed). Here, as in *Chambliss*, the conversation between the victim's father and the juror had nothing to do with the merits of the case. Further, the trial court spoke with each of the jurors and each juror separately verified that they were neither intimidated by the conversation nor concerned that it would affect their service. Based upon the particular facts of this case and the evidence submitted to the trial court,

we cannot say that the trial court abused its discretion in denying appellant's motion for mistrial. Accordingly, we overrule appellant's tenth issue.

### G.    Objection to Jury Argument (Issue 11)

Appellant argues that the trial court abused its discretion in overruling his objection to the prosecutor's closing argument that appellant sexually assaulted the victim's mother before the murders. We disagree.

There are four permissible areas of jury argument: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answering arguments of opposing counsel; and (4) pleas for law enforcement. *See Felder v. State*, 848 S.W.2d 85, 94–95 (Tex. Crim. App. 1992) (en banc). Argument which exceeds these areas is erroneous. *Id.* at 95. Counsel, however, is allowed wide latitude without limitation in drawing inferences from the evidence so long as the inferences drawn are reasonable, fair, legitimate, and offered in good faith. *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988).

In this case, the following exchange took place during the State's closing argument:

| | |
|---|---|
| State: | Now, you will remember in voir dire I told you the State doesn't have to prove motive. It's not one of the elements, but guess what, we've got a motive in this case. You see, George Washington Hicks sexually assaulted Roxanne Jeeves shortly before the murders. We know that. We know that because his semen is inside of Roxanne. His semen is all over her panties, and the way they are in the panties indicate that she did not walk around. |
| Appellant's counsel: | Your Honor, we would object to that as being outside the evidence. |
| The Court: | Overruled. |
| State: | That evidence that you heard indicates that the sexual assault occurred shortly before the murders. |

Appellant argues that this argument should not have been allowed because it was unsupported by the record. The State, however, argued that these comments during closing argument stemmed from the testimony of the Benita Boyd and Tim Fallon. Boyd, a forensic serologist, testified that

as a former employee of Southwestern Institute of Forensic Sciences that it was her job to identify and classify blood and body fluids as well as evidence from a rape kit collected during an autopsy. Boyd testified that she examined vaginal, anal, and oral swabs and smears from the Jeeves's autopsy for the presence of seminal fluid and acid phosphatase. The swabs and smears indicated the presence of sperm and that Jeeves had not washed or cleaned her genital area or had a bowel movement after the semen was deposited. Jennifer Smith, a DNA analyst and forensic scientist, examined Jeeves's underwear and panty liner for the presence of DNA. Smith testified that she recovered sperm cells from the underwear and matched the DNA in the sperm cells to appellant. In addition, Tim Fallon, a trace evidence analyst, testified that it was his job to examine hairs, fibers, chemical residues, gunshot residues, and other items for criminal and civil investigations. He testified that the small bottle of liquid recovered at the crime scene was ethyl ether and water which could be used as an anesthetic. Based upon this evidence presented at trial, we conclude that it was reasonable for the State to infer the possibility that the appellant raped Jeeves. Accordingly, no improper reference to matters outside the record was made and we overrule appellant's eleventh issue.

### H. Legal Insufficiency of the Evidence (Issue 12)

Appellant argues that the evidence is insufficient to support a finding of guilt for the offense of murder. When an appellant challenges the sufficiency of the evidence to support a conviction, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). Evidence is sufficient if "the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict." *Id.* If the evidence is conflicting, we "'presume that the factfinder resolved the conflicts in favor of the

prosecution and defer to that determination." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 326 (1979)).

A person commits the offense of murder if such person "intentionally or knowingly causes the death of an individual" or "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(1)–(2) (West 2011). A culpable mental state is generally proved by circumstantial evidence. *Dillon v. State*, 574 S.W.2d 92, 94 (Tex. Crim. App. [Panel Op.] 1978); *Krause v. State*, 243 S.W.3d 95, 111 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd). A jury may infer intent to cause death from the use of a deadly weapon in a deadly manner. *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996) (jury may infer intent to kill from use of deadly weapon unless it would not be reasonable to infer that death or serious bodily injury could result from use of weapon); *Adanandus v. State*, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993) (if deadly weapon used in deadly manner, inference is "almost conclusive" that defendant intended to kill); *Jackson*, 115 S.W.3d at 329. Appellant argues that the State failed to present sufficient evidence at trial to convict him of murder. We disagree.

In this murder trial, the State presented over twenty witnesses. As summarized above, appellant shot the victim in the head at close range from which the jury could conclude he intended to cause the victim's death. As for the appellant's identification as the assailant, appellant's own DNA—hair, fingerprint, semen—all positively linked him to the crime scene. Other physical evidence also linked appellant to the crime scene. Appellant's former brother-in-law and stepson both identified the blue bag found in Jeeves's car as belonging to appellant. They testified that the blue bag was kept in the bedroom closet and contained a holster, gun, duct tape and rope. Further, they testified that appellant often wore toboggan hats with pins with little sayings on them. Deputy Sheriff Lieutenant Sparks testified that the "E. Oden" notebook found

at the murder scene belonged to Eugene Oden who worked at an office building where appellant performed cleaning services.

Other witnesses saw Jeeves and the victim with an African-American man on the morning of December 23, 1981. Patricia McAvey, Jeeves's next door neighbor, saw an African-American man holding the victim's hand at the apartment complex. Detective Forsyth spoke with a gas station attendant who stated that Jeeves was driving the car with an African-American man in the front seat and a child in the backseat around 9:30 am or 10:00 a.m. on the day of the murders. Another witness—Tamera Tignor—was near the crime scene on the day of the murders to pick up her grandmother. She saw a "dark complexioned" man running across a field toward Cartwright Road on the morning of December 23, 1981. Connie Helms, who was visiting her father in the area of Lawson and Cartwright Roads on December 23, 1981, heard gunfire and then saw a man coming down the road. The man stopped at the house and asked for a drink of water and to use the phone. Tignor described the man as a black man with full cheeks, buggy eyes, and unruly hair. She called the police after seeing the murders featured on Unsolved Mysteries and told the officer that she thought she could recognize the suspect. Tignor later identified appellant in a photo line-up.

When considered in the light most favorable to the verdict, the facts in this case were sufficient to support a conviction of murder. We overrule appellant's twelfth issue.

### I.      *Back Time Credit for Incarceration (Issue 13)*

Appellant argues that he is entitled to back time credit beginning on March 14, 2003, when the original indictment for this crime was issued. The State concedes that appellant is entitled to some additional time and we agree.

Appellant is governed by the law which was in effect at the time of the murders. *See* Act of June 19, 1993, 73rd Leg., R.S., ch. 900, § 5.09(B), 1993 Tex. Gen. Laws 3764 ("An offense

–33–

committed before the effective date of this article is covered by the law in effect when the offense was committed, and the former law is continued in effect for that purpose.").  The version of the Code of Criminal Procedure in effect at the time of the 1981 murders provides as follows:

> Sec. 2. (a) In all criminal cases the judge of the court in which the defendant was convicted shall give the defendant credit on his sentence for the time that the defendant has spent in jail in said cause, from the time of his arrest and confinement until his sentence by the trial court.

*See* Act of May 14, 1981, 67th Leg., R.S., ch. 141, § 1, sec. 2(a), 1981 Gen. Laws 353 (amended 1993 & 2007).[4]

### 1)        Back time credit under first indictment (Cause No. F03-21911)

On April 16, 2003, the Texas Department of Criminal Justice informed the Dallas County Sheriff's Office that notations had been made in their records that appellant would be wanted by your office upon release from their institution.[5]  The letter referenced cause numbers F03-21910 (murder of Jeeves) and F03-21911 (murder of Korper).  An arrest warrant was issued for appellant on April 29, 2003, but was recalled.  A bench warrant was issued on June 2, 2003, and appellant was returned to the Dallas jail.

Another bench warrant was executed on September 15, 2005.  After appellant was convicted on January 29, 2007 in cause number F03-21910, the judgment credited him with time served from September 15, 2005 to January 29, 2007.  On April 11, 2007, the trial court entered a nunc pro tunc in cause number F03-21910 crediting appellant with additional time served from April 16, 2003 until February 16, 2005 and September 15, 2005 through January 29, 2007.

---

[4] The current version of this article can be found at TEX. CODE CRIM. PROC. art. 42.03, § 2(a) (West. Supp. 2014).

[5] At the time of the original indictments, appellant was serving a sentence with the Texas Department of Criminal Justice on another conviction.

**2)** **Back time credit under second indictment (Cause No. F11-00837)**

In this case, a bench warrant was issued on March 15, 2012. The judgment in this case credits appellant with back time for the time period of March 14, 2012 through March 28, 2014 for time served under the second indictment.

**3)** **Analysis**

Appellant is entitled to credit for any time served in jail on either the first or second indictment for Korper's murder. *See Ex parte Hernandez*, 845 S.W.2d 913, 914 (Tex. Crim. App. 1993) (en banc). Appellant was indicted for Korper's murder in April 2003 and that case was not dismissed until February 19, 2007. Accordingly, the time credited to appellant in the nunc pro tunc order for Jeeves's murder should also be credited to appellant for Korper's murder since he was being held for both causes. *Id.* ("It is well-settled that an individual is entitled to all time 'spent in jail in said cause.'")). Thus, appellant should be credited for time served from April 16, 2003 until February 16, 2005 and September 15, 2005 through February 19, 2007, in addition to the time period of March 14, 2012 through March 28, 2014 which was already included in the judgment.

## III. CONCLUSION

We modify the judgment with respect to back-time credit and affirm the judgment as modified.

/ David Evans/
DAVID EVANS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
140417F.U05

–35–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

GEORGE WASHINGTON HICKS,
Appellant

No. 05-14-00417-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 363rd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F11-00837-W.
Opinion delivered by Justice Evans.
Justices Myers and Brown participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

Appellant is credited for time served from April 16, 2003 until February 16, 2005 and September 15, 2005 through February 19, 2007 and March 14, 2012 through March 28, 2014.

As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered this 21st day of July, 2015.